# 01-14-0002-CV

Continuation of using Regina Sophus

Channel 11 News Room

Same used to Use Regina Sophus

<u>Suspects:</u>

**Valetta Brossard***

*Re-Re

FILED IN
1ST COURT OF APPEALS
HOUSTON, TEXAS

FEB 11 2015

CHRISTOPHER A PRINE
CLERK

**Larry Ware**

**Don Surrono**

**Luther Ingrim**

**"Cooney" Deloris William**

**J.B. Conelluis**

**Monica Jone**

**Arlan Deckard**

**District Attorney**

**Kevin Wilson "Skipper"**

**Anderous Alexander "Nip"**

**Larry Bird**

**FBI Alice Fowler at Guard Stack**

Suspects using Madisonville, TX, Cardiography, HPD Station. Suspects pointing the finger upon using Regina Sophus; 3643 N. MacGregor Way Houston, TX accomplish all they did.

2/2/15 12:58 Continuation Move-In on 1/16/15

#1037 Playing and pretending they doing a job... using Regina Sophus and daughters upstairs... Using equipment, <u>flen, satellite,</u> if hiding behind amplified. Tamper with brain ultarmentation, stake out #1037. Please record equipment

(Suspect) J.B. Connelluis

Notified HPD play like I gave wrong Apt. # and address; Plays on phone 281.222.8105

Brain ultarmentation consist of covering up the truth! Brain ultarmentation told suspects, more of.... and about lawsuit... Computer programming of <u>using keycards.</u>

#1037 For threats....

- using my daughter
- stakeout until every keycard is demolished. These people have a problem and yes are guilty.... Of trying their hardest to cover up lawsuit.

Keycards consist of: the original <u>reading</u> of the truth, as to how Regina Sophus was used. I, Regina Sophus, have every exhibit after <u>suspects'</u> stakeout of swindling

Keycards consist of:

- re-recording over
- instilment of fraud
- creating fraud recording

Suspects continue to use Big time Fugitive to use Regina Sophus...New Hope 320 Hamilton St Houston, TX 77002 fan club...

Court of appeals has every inch of evidence. They are prolonging the case...behind keycards, being paid under the table...continue to swap Gallipropsy.

#1037 --- "The State" 2/11/15 1:52 Am

Please continue to Record, Suspect, Harassment. Suspect consist of useing, Keycards. (Dogging out) To cover up the Reading. 4200 Cypress Greek. Legacy Champion Forest. Useing Daughters, For Harassment. (Dora Briggs Suspect) Threats; "Pull Your Head out"

Useing T.V. to stop Volume. 2/2/15 Useing A Camera inside Apartment #1027

Suspect Pointing The Finger Useing......

Madisonville Tx, To Use Regina Sophus

Charlotte Stubblefield, Grey Hair New Hope
APts, Houston Tx. 77002

Dora Briggs

J. B. Cornelluis

Don Surronno

Address of Daughters, I Investigate To Lock-up

Remington Ranch
342 Green Ct,
Houston Tx. 77073

2/11/15 Guilty Party Continue......

Suspects chaseing Key cards to cover up the, original Reading of the truth. Useing Regina Sophus.

Stole Lease Agreement, went thru Red Bag...

Stole daughters Portraits out of Black Purse

Useing, Fleu, SataLite, Instangram, T.V.'s, For Signally. At. 4200 Cypress Creek, Legacy Champion Forest, X-Ray, Digital telescope, Apt. 1032 and Loft...

Please Record......Suspects included within,

Lawsuit. Dora Briggs, (Fe-Fe)

Re-Re, Angela - Holly Hall old Employee...

Don Surnono, Michael Milburn Acting Like D.A.

Employee... Record to Lock-up

Court Employee Unit 1032... and J.B. Cornellius...

01-14-00021-CV        12/18/14        2:19 Am    2/11/15

South Central court....

Suspect stalkout, Continue to use, ReGina Sophus
Use equipment over Apartment unit. #40

At; 3643 N. MacGregor Way. Houston Tx 77004.
#44 #40 Loft #39 Use Amplified.

erase Maude Trauhan, maude Massie, Kevin Wilson,
GallimPhoPsy Suspects use Name included to use

ReGina Sophus, #40 Loft #44 Amplified
Carl Wagne Sampson    Valetta Brossard
Vanessa Smith (try to swap Brain uHumentation)

John EBoo Jackson
RoBBie Lucenda

Name Already included with in Lawsuit.......
Covering up Lawsuit within KeYcand.......
Keycand consist of; original Reading.......

Please continue to record....
We trying to make her A SuPervisor (Suspect).......



**TEXAS APARTMENT ASSOCIATION**

M E M B E R

**This Lease Contract is valid only if filled out before January 1, 2016.**

# Apartment Lease Contract

This is a binding contract. Read carefully before signing.

Date of Lease Contract: _____**January 9, 2015**_____
(when this Lease Contract is filled out)

## Moving In — General Information

**1. Parties.** This Lease Contract ("Lease") is between you, the resident(s) (*list all people signing the Lease*):
**Regina Sophus**

and us, the owner: **ComCapp Timberstone LLC**

**(name of apartment community or title holder). You are renting Apartment No.** **1027**, at **4200 Cypress Creek Pkwy**
(street address) in **Houston**
(city), Texas **77068** (zip code) for use as a private residence only. The terms "you" and "your" refer to all residents listed above or, in the event of a sole resident's death, to someone authorized to act for the estate. The terms "we," "us," and "our" refer to the owner listed above and not to property managers or anyone else. *Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease is the entire agreement between you and us.*

**2. Occupants.** The apartment will be occupied only by you and (*list all other occupants not signing the Lease*):
**Above Only**

—and no one else. Anyone not listed here cannot stay in the apartment for more than **7** consecutive days without our prior written consent, and no more than twice that many days in any one month. *If the previous space isn't filled in, 2 days total per month will be the limit.*

**3. Lease Term.** The initial term of the Lease begins on the **16th** day of ___**January**___ (month), **2015** (year), and ends at midnight the **31st** day of **October** (month), **2015** (year). After that, this Lease will automatically renew month-to-month unless either party gives at least **60** days' written notice of termination or intent to move out as required by Par. 36. *If the number of days isn't filled in, notice of at least 30 days is required.*

**4. Security Deposit.** The total security deposit for all residents is $ **200.00**, due on or before the date this Lease is signed. This amount [*check one*]: ☐ does *or* ☒ does not include an animal deposit. Any animal deposit will be designated in an animal addendum. Security-deposit refund check and any deduction itemizations will be by [*check one*]:
☒ one check jointly payable to all residents and mailed to any one resident we choose, *or*
☐ one check payable to and mailed to _____
_____
(specify name of one resident).
If neither option is checked here, the first option applies. See Par. 40 and 41 for security-deposit return information.

**5. Keys, Move-Out, and Furniture.** You'll be given **2** apartment key(s), **1** mailbox key(s), and _____ other access devices for **Gate Remote** .
*Before moving out, you must give our representative advance written move-out notice as stated in Par. 36.* The move-out date in your notice [*check one*]: ☐ must be the last day of the month, *or* ☒ may be the exact day designated in your notice. If neither option is checked here, the second applies. Any resident, occupant, or spouse who, according to a remaining resident's affidavit, has permanently moved out or is under court order not to enter the apartment, is (at our option) no longer entitled to

Prorated rent of $ **432.00** is due for the remainder of the [*check one*]: ☒ 1st month *or* ☐ 2nd month, on the _____ day of _____ (month), _____ (year). *You must pay your rent on or before the 1st day of each month (due date). There is no grace period. Cash is not acceptable without our prior written permission. You cannot withhold or offset rent unless authorized by law.* We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. If you don't pay all rent on or before the **3rd** day of the month, you'll pay an initial late charge of $ **50.00**, plus a daily late charge of $ **10.00** per day after that date until the amount due is paid in full. Daily late charges cannot exceed 15 days for any single month's rent. We won't impose late charges until at least the third day of the month. You'll also pay a charge of $ **50.00** for each returned check or rejected electronic payment, plus initial and daily late charges, until we receive acceptable payment. If you don't pay rent on time, you'll be in default and subject to all remedies under state law and this Lease. If you violate the animal restrictions of Par. 27 or other animal rules, you'll pay an initial charge of $ **100.00** per animal (not to exceed $100 per animal) and a daily charge of $ **10.00** per animal (not to exceed $10 per day per animal) from the date the animal was brought into your apartment until it is removed. We'll also have all other remedies for such violations.

**7. Utilities and Services.** We'll pay for the following items, if checked: ☐ gas ☐ water ☐ wastewater ☐ electricity ☐ trash/recycling ☐ cable/satellite ☐ master antenna ☐ Internet ☐ stormwater/drainage ☐ other _____ .
You'll pay for all other utilities and services, related deposits, and any charges or fees on such utilities and services during your Lease term. See Par. 12 for other related provisions regarding utilities and services.

**8. Insurance.** *Our insurance doesn't cover the loss of or damage to your personal property.* You are [*check one*]:
☒ required to buy and maintain renter's or liability insurance (see attached addendum), *or*
☐ not required to buy renter's or liability insurance.
*If neither option is checked, insurance is not required but is still strongly recommended. Even if not required, we urge you to get your own insurance for losses due to theft, fire, water, pipe leaks, and similar occurrences.* Renter's insurance doesn't cover losses due to a flood. Information on renter's insurance is available from the Texas Department of Insurance.

**9. Special Provisions.** The following or attached special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease and will supersede any conflicting provisions of this printed Lease form.
**If lease is not renewed, a $200 MTM fee will be charged each month. If proof of current $100,000 property liability insurance is not received by mgmt, a $75 risk assessment fee will be charged each month. No partial payments accepted.**

**10. Unlawful Early Move-Out And Reletting Charge.**
**10.1 Your Responsibility.** You'll be liable for a reletting charge of $ **734.40** (not to exceed 85% of the highest

**10.2 Not a Release.** The reletting charge is neither a Lease cancellation nor a buyout fee. It is a liquidated amount covering only part of our damages—for our time, effort, and expense in finding and processing a replacement resident. These damages are uncertain and hard to ascertain—particularly those relating to inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of our damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must pay our actual reletting costs as far as they can be determined. The reletting charge doesn't release you from continued liability for future or past-due rent; charges for cleaning, repairing, repainting, or dealing with unreturned keys; or other sums due.

## 11. Security Devices.

**11.1 What We Provide.** *Texas Property Code secs. 92.151, 92.153, and 92.154 require, with some exceptions, that we provide at no cost to you when occupancy begins: (A) a window latch on each window; (B) a doorviewer (peephole) on each exterior door; (C) a pin lock on each sliding door; (D) either a door-handle latch or a security bar on each sliding door; (E) a keyless bolting device (deadbolt) on each exterior door; and (F) either a keyed doorknob lock or a keyed deadbolt lock on one entry door. Keyed locks will be rekeyed after the prior resident moves out. The rekeying will be done either before you move in or within 7 days after you move in, as required by law. If we fail to install or rekey security devices as required by law, you have the right to do so and deduct the reasonable cost from your next rent payment under Texas Property Code sec. 92.165(1). We may deactivate or not install keyless bolting devices on your doors if (A) you or an occupant in the dwelling is over 55 or disabled, and (B) the requirements of Texas Property Code sec. 92.153(e) or (f) are satisfied.*

**11.2 Who Pays What.** We'll pay for missing security devices that are required by law. ***You'll pay for: (A) rekeying that you request (unless we failed to rekey after the previous resident moved out); and (B) repairs or replacements because of misuse or damage by you or your family, your occupants, or your guests.*** You must pay immediately after the work is done unless state law authorizes advance payment. You must also pay in advance for any additional or changed security devices you request.

## 12. Other Utilities and Services.
Television channels that are provided may be changed during the Lease term if the change applies to all residents. You may use utilities only for normal household purposes and must not waste them. If your electricity is interrupted, you must use only battery-operated lighting (no flames). You must not allow any utilities (other than cable or Internet) to be cut off or switched for any reason—including disconnection for not paying your bills—until the Lease term or renewal period ends. If a utility is submetered or prorated by an allocation formula, we'll attach an addendum to this Lease in compliance with state-agency rules. If a utility is individually metered, it must be connected in your name and you must notify the provider of your move-out date so the meter can be timely read. If you delay getting it turned on in your name by the Lease's start date or cause it to be transferred back into our name before you surrender or abandon the apartment, you'll be liable for a $_50.00_ charge (not to exceed $50 per violation), plus the actual or estimated cost of the utilities used while the utility should have been connected in your name. If you're in an area open to competition and your apartment is individually metered, you may choose or change your retail electric provider at any time. If you qualify, your provider will be the same as ours, unless you choose a different provider. If you do choose or change your provider, you must give us written notice. You must pay all applicable provider fees, including any fees to change service back into our name after you move out.

## 13. Damages and Reimbursement.

**13.1 Damage in the Apartment Community.** You must promptly pay or reimburse us for loss, damage, conse-

**13.2 Indemnification by You.** *You'll defend, indemnify and hold us harmless from all liability arising from your conduct or that of your invitees, your occupants, your guests, or our representatives who at your request perform services not contemplated in this Lease.*

**13.3 Damage and Wastewater Stoppage.** *Unless damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacements, and damage of the following kind if occurring during the Lease term or renewal period: (A) damage to doors, windows, or screens; (B) damage from windows or doors left open; and (C) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment.*

**13.4 No Waiver.** We may require payment at any time, including advance payment to repair damage that you are liable for. Delay in demanding sums you owe is not a waiver.

## 14. Contractual Lien and Property Left in Apartment.

**14.1 Lien Against Your Property for Rent.** *All property in the apartment (unless exempt under Texas Property Code sec. 54.042) is subject to a contractual lien to secure payment of delinquent rent (except as prohibited by Texas Government Code sec. 2306.6738, for owners supported by housing-tax-credit allocations).* For this purpose, "apartment" excludes common areas but includes the interior living areas and exterior patios, balconies, attached garages, and any storerooms for your exclusive use.

**14.2 Removal After We Exercise Lien for Rent.** *If your rent is delinquent, our representative may peacefully enter the apartment, and remove and/or store all property subject to lien.* All property in the apartment is presumed to be yours unless proved otherwise. After the property is removed, a written notice of entry must be left in a conspicuous place in the apartment—including a list of items removed, the amount of delinquent rent due, and the name, address, and phone number of the person to contact. The notice must also state that the property will be promptly returned when the delinquent rent is fully paid.

**14.3 Removal After Surrender, Abandonment, or Eviction.** We, or law officers, may remove or store all property remaining in the apartment or in common areas (including any vehicles you or any occupant or guest owns or uses) if you're judicially evicted or if you surrender or abandon the apartment (see definitions in Par. 41).

**14.4 Storage.**
 (A) *No duty.* We'll store property removed under a contractual lien. We may—but we have no duty to—store property removed after judicial eviction, surrender, or abandonment of the apartment.
 (B) *No liability.* We're not liable for casualty, loss, damage, or theft, except for property removed under a contractual lien.
 (C) *Charges you pay.* You must pay reasonable charges for our packing, removing, storing, and selling of any property.
 (D) *Our lien.* We have a lien on all property removed and stored after surrender, abandonment, or judicial eviction for all sums you owe, with one exception: our lien on property listed under Texas Property Code sec. 54.042 is limited to charges for packing, removing, and storing.

**14.5 Redemption.**
 (A) *Property on which we have a lien.* If we've seized and stored property under a contractual lien for rent as authorized by law, you may redeem the property by paying all delinquent rent due at the time of seizure. But if notice of sale (see Par. 14.6(C)) is given before you seek redemption, you may redeem only by paying the delinquent rent plus our reasonable charges for packing, removing, and storing.
 (B) *Property removed after surrender, abandonment, or judicial eviction.* If we've removed and stored property after surrender, abandonment, or judicial eviction, you may redeem only by paying all sums you owe, including rent, late charges, reletting charges, storage charges, damages, etc.
 (C) *Place and payment for return.* We may return redeemed property at the place of storage, the manage-

(1) left in the apartment after surrender or abandonment; *or*

(2) left outside more than 1 hour after writ of possession is executed, following judicial eviction.

**(B)** *Animals.* An animal removed after surrender, abandonment, or eviction may be kenneled or turned over to a local authority, humane society, or rescue organization.

**(C)** *Sale or property.* Property not thrown away or given to charity may be disposed of only by sale, which must be held no sooner than 30 days after written notice of the date, time, and place of sale is sent by both regular mail and certified mail (return receipt requested) to your last known address. The notice must itemize the amounts you owe and provide the name, address, and phone number of the person to contact about the sale, the amount owed, and your right to redeem the property. The sale may be public or private; is subject to any third-party ownership or lien claims; must be to the highest cash bidder; and may be in bulk, in batches, or item-by-item. If the proceeds from the sale are more than you owe, the excess amount must be mailed to you at your last known address within 30 days after sale.

**15. Failing to Pay First Month's Rent.** If you don't pay the first month's rent when or before the Lease begins, all future rent for the Lease term will be automatically accelerated without notice and become immediately due. We also may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. Our rights, remedies and duties under Par. 10 and 32 apply to acceleration under this paragraph.

**16. Rent Increases and Lease Changes.** No rent increases or Lease changes are allowed before the initial Lease term ends, except for those allowed by special provisions in Par. 9, by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under Par. 19. If, at least 5 days before the advance-notice deadline referred to in Par. 3, we give you written notice of rent increases or Lease changes that become effective when the Lease term or renewal period ends, this Lease will automatically continue month-to-month with the increased rent or Lease changes. The new modified Lease will begin on the date stated in the notice (without needing your signature) unless you give us written move-out notice under Par. 36. The written move-out notice under Par. 36 applies only to the end of the current Lease or renewal period.

**17. Delay of Occupancy.**

**17.1 Lease Remains In Force.** We are not responsible for any delay of your occupancy caused by construction, repairs, cleaning, or a previous resident's holding over. This Lease will remain in force subject to:
(A) abatement of rent on a daily basis during delay, *and*
(B) your right to terminate the lease in writing as set forth below.

**17.2 Your Termination Rights.** Termination notice must be in writing. After termination, you are entitled only to refund of any deposit(s) and any rent you paid. Rent abatement or Lease termination does not apply if the delay is for cleaning or repairs that don't prevent you from moving into the apartment.

**17.3 Notice of Delay.** If there is a delay of your occupancy and we haven't given notice of delay as set forth immediately below, you may terminate this Lease up to the date when the apartment is ready for occupancy, but not later.
(a) If we give written notice to any of you or your occupants when or after the Lease begins—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date—you may terminate the Lease within 3 days after you receive written notice, but no later.
(b) If we give any of you written notice before the date the Lease begins and the notice states that a construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease within 7 days after receiving written notice, but no later. The readiness date stated in the written notice becomes the new effective Lease date for all purposes. This new date can't be moved to an earlier

**19. Community Policies and Rules.**

**19.1 Generally.** Our rules are considered part of this Lease. You, your occupants, and your guests must comply with all written apartment rules and community policies, including instructions for care of our property. We may regulate: (A) the use of patios, balconies, and porches; (B) the conduct of furniture movers and delivery persons; and (C) activities in common areas. We may make reasonable changes to written rules, and those rules can become effective immediately if the rules are distributed and applicable to all units in the apartment community and do not change the dollar amounts on pages 1 or 2 of this Lease.

**19.2 Some Specifics.** Your apartment and other areas reserved for your private use must be kept clean. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs.

**19.3 Limitations on Conduct.** Glass containers are prohibited in or near pools and all other common areas. Within the apartment community, you, your occupants, and your guests must not use candles or kerosene lamps or heaters without our prior written approval, or cook on balconies or outside. You, your occupants, and your guests must not solicit business or contributions. Conducting any kind of business (including child-care services) in your apartment or in the apartment community is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes.

**19.4 Exclusion of Persons.** We may exclude from the apartment community any guests or others who, in our judgment, have been violating the law, violating this Lease or our rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area anyone who refuses to show photo identification or refuses to identify himself or herself as a resident, an occupant, or a guest of a specific resident in the community.

**19.5 Notice of Convictions and Registration.** You must notify us within 15 days if you or any of your occupants are convicted of (A) any felony, or (B) any misdemeanor involving a controlled substance, violence to another person, or destruction of property. You must also notify us within 15 days if you or any of your occupants register as a sex offender. Informing us of a criminal conviction or sex-offender registration doesn't waive any rights we may have against you.

**20. Prohibited Conduct.** You, your occupants, and your guests may not engage in the following activities:
(a) criminal conduct; manufacturing, delivering, or possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; or displaying or possessing a gun, knife, or other weapon in the common area in a way that may alarm others;
(b) behaving in a loud or obnoxious manner;
(c) disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community;
(d) disrupting our business operations;
(e) storing anything in closets containing gas appliances;
(f) tampering with utilities or telecommunications;
(g) bringing hazardous materials into the apartment community;
(h) using windows for entry or exit;
(i) heating the apartment with a gas-operated cooking stove or oven; *or*
(j) injuring our reputation by making bad-faith allegations against us to others.

**21. Parking.** We may regulate the time, manner, and place of parking all cars, trucks, motorcycles, bicycles, boats, trailers, and rec-

(d) belongs to a resident or occupant who has surrendered or abandoned the apartment;

(e) is in a handicapped space without the legally required handicapped insignia;

(f) is in a space marked for office visitors, managers, or staff;

(g) blocks another vehicle from exiting;

(h) is in a fire lane or designated "no parking" area;

(i) is in a space marked for another resident or apartment;

(j) is on the grass, sidewalk, or patio;

(k) blocks a garbage truck from access to a dumpster;

(l) has no current license, registration, or inspection sticker and we have given you at least 10 days' notice that the vehicle will be towed if not removed; or

(m) is not moved to allow parking lot maintenance.

## 22. Release of Resident.

**22.1 Generally.** *You may have the right under Texas law to terminate the Lease early in certain situations involving family violence, certain sexual offenses, or stalking.* Otherwise, unless you're entitled to terminate this Lease under Par. 9, 17, 23, 31, or 36, you won't be released from this Lease for any reason—including voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of coresidents, loss of employment, bad health, property purchase, or death.

**22.2 Death of Sole Resident.** If you are the sole resident and die during the Lease term, an authorized representative of your estate may terminate the Lease without penalty by giving at least 30 days' written notice. Your estate will be liable for paying rent until the latter of: (A) the termination date or (B) removal of all possessions in the apartment. Your estate will also be liable for all charges and damages until the apartment is vacated, and any removal or storage costs.

## 23. Military Personnel.

**23.1 Termination Rights.** *You may have the right under Texas law to terminate the Lease in certain situations involving military deployment or transfer.* You may terminate the Lease if you enlist, are drafted into, or are commissioned in the U.S. Armed Forces. You also may terminate the Lease if:

(a) you are (1) a member of the U.S. Armed Forces or Reserves on active duty, or (2) a member of the National Guard called to active duty for more than 30 days in response to a national emergency declared by the President; *and*

(b) you (1) receive orders for a permanent change of station, (2) receive orders to deploy with a military unit or as an individual in support of a military operation for 90 days or more, or (3) are relieved or released from active duty.

**23.2 How to Terminate Under This Par. 23.** You must furnish us a copy of your military orders, such as permanent-change-of-station orders, call-up orders, or deployment orders (or letter equivalent). Military permission for base housing doesn't constitute a permanent-change-of-station order. You must deliver to us your written termination notice, after which the Lease will be terminated under this military clause 30 days after the date your next rental payment is due. After your move-out, we'll return your security deposit, less lawful deductions.

**23.3 Who May Be Released.** For the purposes of this Lease, orders described in (b) under Par. 23.1 above will release only the resident who qualifies under both (a) and (b) above and receives the orders during the Lease term, plus that resident's spouse or legal dependents living in the resident's household. A coresident who is not the spouse or dependent of a military resident cannot terminate under this military clause.

**23.4 Your Representations.** Unless you state otherwise in Par. 9, you represent when signing this Lease that:

(a) you do not already have deployment or change-of-station orders;

(b) you will not be retiring from the military during the Lease term; *and*

(c) the term of your enlistment or obligation will not end before the Lease term ends.

## 24. Resident Safety and Loss.

**24.1 Disclaimer.** *We disclaim any express or implied warranties of security.* We care about your safety and that of other occupants and guests. You agree to make every effort to follow any Security Guidelines Addendum attached to this Lease. *No security system is failsafe. Even the best system can't prevent crime. Always act as if security systems don't exist since they are subject to malfunction, tampering, and human error. The best safety measures are the ones you take as a matter of common sense and habit.*

**24.2 Your Duty of Due Care.** You, your occupants, and your guests must exercise due care for your own and others' safety and security, especially in using smoke alarms and other detection devices, door and window locks, and other safety or security devices. Window screens are not for security or to keep people from falling out of windows.

**24.3 Alarm and Detection Devices.**

(A) *What we'll do.* We'll furnish smoke alarms or other detection devices required by law or city ordinance. We may install additional detectors not so required. We'll test them and provide working batteries when you first take possession of your apartment. Upon request, we'll provide, as required by law, a smoke alarm capable of alerting a person with a hearing-impairment disability.

(B) *Your duties.* You must pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report alarm or detector malfunctions to us. Neither you nor others may disable alarms or detectors. *If you damage or disable the smoke alarm, or remove a battery without replacing it with a working battery, you may be liable to us under Texas Property Code sec. 92.2611 for $100 plus one month's rent, actual damages, and attorney's fees.* You'll be liable to us and others if you fail to report malfunctions, or fail to report any loss, damage, or fines resulting from fire, smoke, or water.

**24.4 Loss.** Unless otherwise required by law, we're not liable to any resident, guest, or occupant for personal injury or damage, loss of personal property, or loss of business or personal income, from any cause, including fire, smoke, rain, flood, water leaks, hail, ice, snow, lightning, wind, explosions, interruption of utilities, pipe leaks, theft, vandalism, and negligent or intentional acts of residents, occupants, or guests. We have no duty to remove any ice, sleet, or snow but may remove any amount with or without notice. Unless we instruct otherwise, during freezing weather you must for 24 hours a day: (A) keep the apartment heated to at least 50° Fahrenheit, (B) keep cabinet and closet doors open, and (C) drip hot- and cold-water faucets. You'll be liable for any damage to our and others' property caused by broken water pipes due to your violating these requirements.

**24.5 Crime or Emergency.** Immediately dial 911 or call local medical-emergency, fire, or police personnel in case of accident, fire, smoke, suspected criminal activity, or any other emergency involving imminent harm. You should then contact our representative. None of our security measures are an express or implied warranty of security—or a guarantee against crime or of reduced risk of crime. Unless otherwise provided by law, we're not liable to you, your occupants, or your guests for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. Even if previously provided, we're not obliged to furnish security personnel, patrols, lighting, gates, fences, or other forms of security unless required by law. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you, your occupants, or your guests are affected by a crime, you must make a written report to the appropriate local law-enforcement agency and to our representative. You must also give us the law-enforcement agency's incident-report number upon request.

## 25. Condition of the Premises and Alterations.

**25.1 As-Is.** *We disclaim all implied warranties.* You...

**25.2 Standards and Improvements.** You must use customary diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by law or by us in writing, you must not do any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. Unless our rules state otherwise, we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and grooves of wood-paneled walls. No water furniture, washing machines, extra phone or television outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless allowed by law or we've consented in writing. You may install a satellite dish or antenna, but only if you sign our satellite-dish or antenna lease addendum, which complies with reasonable restrictions allowed by federal law. You must not alter, damage, or remove our property, including alarm systems, detection devices, furniture, telephone and television wiring, screens, locks, and security devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (made with or without our consent) become ours unless we agree otherwise in writing.

**25.3 Fair Housing.** We are committed to the principles of fair housing. In accordance with fair-housing laws, we'll make reasonable accommodations to our rules, policies, practices, or services. We'll allow reasonable modifications under these laws to give disabled persons access to and use of this apartment community. We may require you to sign an addendum regarding the implementation of any accommodations or modifications, as well as your restoration obligations, if any.

## 26. Requests, Repairs, and Malfunctions.

**26.1 Written Requests Required.** *If you or any occupant needs to send a notice or request—for example, for repairs, installations, services, ownership disclosure, or security-related matters—it must be written, signed, and delivered to our designated representative* (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, crime in progress, or fair-housing accommodation or modification). Our written notes on your oral request do not constitute a written request from you. Our complying with or responding to any oral request regarding security or any other matter doesn't waive the strict requirement for written notices under this Lease.

**26.2 Required Notifications.** You must promptly notify us in writing of water leaks, mold, electrical problems, malfunctioning lights, broken or missing locks or latches, and other conditions that pose a hazard to property, health, or safety.

**26.3 Utilities.** We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately.

**26.4 Air-Conditioning and Other Equipment.** Air-conditioning problems are normally not emergencies. If air-conditioning or other equipment malfunctions, you must notify us as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections, taking into consideration when casualty-insurance proceeds are received. Your rent will not abate in whole or in part.

**26.5 Our Right to Terminate.** If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate this Lease by giving you at least 5 days' written notice. We also have the right to terminate this Lease during the Lease term by giving you at least 30 days' written notice of termination if we are demolishing your apartment or closing it and it will no longer be used for residential purposes for at least 6 months. If the Lease is so terminated, we'll refund prorated rent and all deposits, less lawful deductions. We may also remove personal property if it causes a health or safety hazard.

## 27. Animals.

The animal addendum includes information governing animals, including assistance or service animals. We'll authorize an assistance or support animal for a disabled person without requiring an animal deposit. We may require verification of your disability and the need for such an animal. You must not feed stray or wild animals.

**27.2 Violations of Animal Policies.**

**(A)** *Charges for violations.* If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for all cleaning and repair costs, including defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except attorney's fees and litigation costs) in enforcing animal restrictions and rules.

**(B)** *Removal and return of animal.* We may remove an unauthorized animal by (1) leaving, in a conspicuous place in the apartment, a written notice of our intent to remove the animal within 24 hours; and (2) following the procedures of Par. 28. We may keep or kennel the animal, or turn it over to a humane society, local authority or rescue organization. When keeping or kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. You must pay for the animal's reasonable care and kenneling charges. We'll return the animal to you upon request if it has not already been turned over to a humane society, local authority or rescue organization. We have no lien on the animal for any purpose.

## 28. When We May Enter.
If you or any guest or occupant is present, then repairers, servicers, contractors, law officers, government representatives, lenders, appraisers, prospective residents or buyers, insurance agents, persons authorized to enter under your rental application, or our representatives may peacefully enter the apartment at reasonable times for reasonable business purposes. If nobody is in the apartment, then any such person may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary) for reasonable business purposes if written notice of the entry is left in a conspicuous place in the apartment immediately after the entry.

## 29. Multiple Residents.
Each resident is jointly and severally liable for all Lease obligations. If you or any guest or occupant violates the Lease or rules, all residents are considered to have violated the Lease. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant constitute notice from all residents. Your notice of Lease termination may be given only by a resident. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Any resident who defaults under this Lease will indemnify the nondefaulting residents and their guarantors.

## Replacements

## 30. Replacements and Subletting.

**30.1 When Allowed.** Replacing a resident, subletting, or assigning a resident's rights is allowed *only when we consent in writing.* If a departing or remaining resident finds a replacement resident acceptable to us before moving out and we expressly consent to the replacement, subletting, or assignment, then:

(a) a reletting charge will not be due;

(b) a reasonable administrative (paperwork) fee will be due, and a rekeying fee will be due if rekeying is requested or required; *and*

(c) the departing and remaining residents will remain liable for all Lease obligations for the rest of the original Lease term.

**30.2 Procedures for Replacement.** If we approve a replacement resident, then, at our option: (A) the replacement resident must sign this Lease with or without an increase in the total security deposit; or (B) the remaining and replacement residents must sign an entirely new Lease. Unless we

**31. Our Responsibilities.**

**31.1 Generally.** We'll act with customary diligence to:

(a) keep common areas reasonably clean, subject to Par. 25;

(b) maintain fixtures, hot water, heating, and air-conditioning equipment;

(c) substantially comply with all applicable laws regarding safety, sanitation, and fair housing; *and*

(d) make all reasonable repairs, subject to your obligation to pay for damages for which you're liable.

**31.2 Your Remedies.** *If we violate any of the above, you may possibly terminate this Lease and exercise other remedies under Texas Property Code Sec. 92.056 by following this procedure:*

(a) all rent must be current, and you must make a written request for repair or remedy of the condition—after which we'll have a reasonable time for repair or remedy;

(b) if we fail to do so, you must make a second written request for the repair or remedy (to make sure that there has been no miscommunication between us)—after which we'll have a reasonable time to repair or remedy; *and*

(c) if the repair or remedy still hasn't been accomplished within that reasonable time period, you may immediately terminate this Lease by giving us a final written notice.

*You also may exercise other statutory remedies, including those under Texas Property Code sec. 92.0561.*

**31.3 Request by Mail.** Instead of giving the two written requests referred to above, you may give us one request by certified mail, return receipt requested, or by registered mail—after which we'll have a reasonable time to repair or remedy. "Reasonable time" accounts for the nature of the problem and the reasonable availability of materials, labor, and utilities. Your rent must be current when you make any request. We'll refund security deposits and prorated rent as required by law.

**32. Default by Resident.**

**32.1 Acts of Default.** You'll be in default if: (A) you don't timely pay rent or other amounts you owe; (B) you or any guest or occupant violates this Lease, apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (C) you abandon the apartment; (D) you give incorrect or false answers in a rental application; (E) you or any occupant is arrested, charged, detained, convicted, or given deferred adjudication or pretrial diversion for (1) a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia as defined in the Texas Controlled Substances Act, or (2) any sex-related crime, including a misdemeanor; (F) you are found to have any illegal drugs or paraphernalia in your apartment; or (G) you or any occupant, in bad faith, makes an invalid habitability complaint to an official or employee of a utility company or the government.

**32.2 Eviction.** *If you default or hold over, we may end your right of occupancy by giving you at least a 24-hour written notice to vacate.* Notice may be given by: (A) regular mail; (B) certified mail, return receipt requested; (C) personal delivery to any resident; (D) personal delivery at the apartment to any occupant over 16 years old; or (E) affixing the notice to the inside of the apartment's main entry door. Notice by mail will be considered delivered on the earlier of actual delivery, or 3 days (not counting Sundays or federal holidays) after the notice is deposited in the U.S. Postal Service with postage. Termination of your possession rights or a later reletting doesn't release you from liability for future rent or other Lease obligations. *After giving notice to vacate or filing an eviction suit, we may still accept rent or other sums due;* the filing or acceptance doesn't waive or diminish our right of eviction or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages, to past or future rent or other sums, or to our continuing with eviction proceedings.

**32.3 Acceleration.** Unless we elect not to accelerate rent, all monthly rent for the rest of the Lease term or renewal pe-

a default for which we need not give you notice. Remaining rent will also be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations below.

**32.4 Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then (A) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (B) rent for the holdover period will be increased by 25% over the then-existing rent, without notice; (C) you'll be liable to us (subject to our mitigation duties) for all rent for the full term of the previously signed Lease of a new resident who can't occupy because of the holdover; and (D) at our option, we may extend the Lease term—for up to one month from the date of notice of Lease extension—by delivering written notice to you or your apartment while you continue to hold over.

**32.5 Other Remedies.** We may report unpaid amounts to credit agencies. If we or a third-party debt collector we use tries to collect any money you owe us, you agree that we or the debt collector may call you on your cellphone and may use an automated dialer. If you default, you will pay us, in addition to other sums due, any amounts stated to be rental discounts or concessions agreed to in writing. Upon your default, we have all other legal remedies, including Lease termination and statutory lockout under Texas Property Code sec. 92.0081, *except as lockouts and liens are prohibited by Texas Government Code sec. 2306.6738 for owners supported by housing-tax-credit allocations.* A prevailing party may recover reasonable attorney's fees and all other litigation costs from the nonprevailing parties, except a party may not recover attorney's fees and litigation costs in connection with a party's claims seeking personal-injury, sentimental, exemplary or punitive damages. We may recover attorney's fees in connection with enforcing our rights under this Lease. You agree that late charges are liquidated damages representing a reasonable estimate of the value of our time, inconvenience, and overhead associated with collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts you owe, including judgments, bear 18% interest per year from the due date, compounded annually. You must pay all collection-agency fees if you fail to pay sums due within 10 days after we mail you a letter demanding payment and stating that collection-agency fees will be added if you don't pay all sums by that deadline.

**32.6 Mitigation of Damages.** If you move out early, you'll be subject to Par. 10 and all other remedies. We'll exercise customary diligence to relet and minimize damages. We'll credit all later rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

**33. Other Important Provisions.**

**33.1 Representatives' Authority; Waivers; Notice.** *Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease or any part of it unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives, unless in writing.* Any dimensions and sizes provided to you relating to the apartment are only approximations or estimates; actual dimensions and sizes may vary. No action or omission by us will be considered a waiver of our rights or of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights isn't a waiver under any circumstances. Except when notice or demand is required by law, you waive any notice and demand for performance from us if you default. If anyone else has guaranteed performance of this Lease, a separate Lease Guaranty for each guarantor must be executed. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease

remedies. All provisions regarding our nonliability or non-duty apply to our employees, agents, and management companies. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf. This Lease binds subsequent owners. This Lease is subordinate to existing and future recorded mortgages, unless the owner's lender chooses otherwise. All Lease obligations must be performed in the county where the apartment is located. Neither an invalid clause nor the omission of initials on any page invalidates this Lease. If you have insurance covering the apartment or your personal belongings at the time you or we suffer or allege a loss, you and we agree to waive any insurance subrogation rights. All notices and documents may be in English and, at our option, in any other language that you read or speak. The term "including" in this Lease should be interpeted to mean "including but not limited to."

**34. Payments.** Payment of each sum due is an independent covenant. When we receive money, other than sale proceeds under Par. 14 or utility payments subject to government regulation, we may apply it at our option and without notice first to any of your unpaid obligations, then to current rent. We may do so regardless of notations on checks or money orders and regardless of when the obligations arose. All sums other than rent are due upon our demand. After the due date, we do not have to accept any payments.

**35. TAA Membership.** We represent that, at the time of signing this Lease, we, the management company representing us, or any locator service that procured you is a member in good standing of both the Texas Apartment Association and the affiliated local apartment association for the area where the apartment is located. The member is either an owner/management-company member or an associate member doing business as a locator service (whose name and address must be disclosed on page 8). If not, the following applies: (A) this Lease is voidable at your option and is unenforceable by us (except for property damages); and (B) we may not recover past or future rent or other charges. The above remedies also apply if both of the following occur: (1) the Lease is automatically renewed on a month-to-month basis more than once after membership in TAA and the local association has lapsed; and (2) neither the owner nor the management company is a member of TAA and the local association during the third automatic renewal. A signed affidavit from the affiliated local apartment association attesting to nonmembership when the Lease or renewal was signed will be conclusive evidence of nonmembership. Governmental entities may use TAA forms if TAA agrees in writing.

## When Moving Out

**36. Move-Out Notice.**

**36.1 Requirements and Compliance.** Your move-out notice doesn't release you from liability for the full term of the Lease or renewal term. You'll still be liable for the entire Lease term if you move out early except under Par. 9, 17, 22, 23, or 31. *Your move-out notice must comply with each of the following:*
(a) We must receive advance written notice of your move-out date. You must give notice in advance by at least the number of days required in Par. 3 or in special provisions—even if the Lease has become a month-to-month lease. Unless we require more than 30 days' notice, if you give notice on the first day of the month you intend to move out, it will suffice for move-out on the last day of that month, as long as all other requirements below are met.
(b) Your move-out notice must be in writing. An oral move-out notice will not be accepted and will not terminate your Lease.
(c) Your move-out notice must not terminate the Lease sooner than the end of the Lease term or renewal period.
(d) If we require you to give us more than 30 days' written notice to move out before the end of the Lease term, we will give you 1 written reminder not less than 5 days nor more than 90 days before your deadline for giving us your written move-out notice. If we fail to give a reminder notice, 30 days' written notice to move-out is required.

**36.2 Unacceptable Notice.** *Your notice is not acceptable if it doesn't comply with all of the above.* We recommend that you use our written move-out form. Your move-out

the Lease term or renewal period ends unless all rent for the entire Lease term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under Par. 10 and 32. You're prohibited by law from applying any security deposit to rent. You can't stay beyond the date you're supposed to move out. All residents, guests, and occupants must surrender or abandon the apartment before the 30-day period for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**38. Cleaning.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges—including charges for cleaning carpets, draperies, furniture, walls, etc. that are soiled beyond normal wear (that is, wear or soiling that occurs without negligence, carelessness, accident, or abuse).

**39. Move-Out Inspection.** You should meet with our representative for a move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final accounting or refunding.

**40. Security Deposit Deductions and Other Charges.** You'll be liable for the following charges, if applicable: unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing alarm or detection-device batteries at any time; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone, Internet, television services, or rental items (if you so request or have moved out); trips to open the apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized security devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under Par. 14; removing or booting illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to our negligence; animal-related charges under Par. 6 and 27; government fees or fines against us for violation (by you, your occupants, or your guests) of local ordinances relating to alarms and detection devices, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for our time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease. You'll be liable to us for: (A) charges for replacing any keys and access devices referenced in Par. 5 if you don't return them all on or before your actual move-out date; (B) accelerated rent if you've violated Par. 32; and (C) a reletting fee if you've violated Par. 10.

**41. Deposit Return, Surrender, and Abandonment.**

**41.1 Your Deposit.** We'll mail you your security-deposit refund (less lawful deductions) and an itemized accounting of any deductions, no later than 30 days after surrender or abandonment, unless laws provide otherwise.

**41.2 Surrender.** You have *surrendered* the apartment when: (A) the move-out date has passed and no one is living in the apartment in our reasonable judgment; *or* (B) apartment keys and access devices listed in Par. 5 have been turned in to us—whichever happens first.

**41.3 Abandonment.** You have *abandoned* the apartment when all of the following have occurred: (A) everyone appears to have moved out in our reasonable judgment; (B) clothes, furniture, and personal belongings have been substantially removed in our reasonable judgment; (C) you've been in default for nonpayment of rent for 5 consecutive days, or water, gas, or electric service for the apartment not connected in our name has been terminated or transferred; *and* (D) you've not responded for 2 days to our notice left on the inside of the main entry door stating that we consider the apartment abandoned. An apartment is also considered abandoned 10 days after the death of a sole resident.

**41.4 The Ending of Your Rights.** Surrender, abandonment, or

## SUMMARY OF KEY INFORMATION

*The lease will control if there's a conflict with this summary.*

- Address: __4200 Cypress Creek Pkwy__ Unit # __1027__
- Beginning date of Lease (Par. 3) __01/16/2015__
- Ending date of Lease (Par. 3) __10/31/2015__
- Number of days notice for termination (Par. 3) __60__
- Consent for guests staying more than __7__ days (Par. 2)
- Total security deposit (Par. 4) $ __200.00__
- Animal deposit (if any) $ __0.00__
- Security deposit (Par. 4) ☐ does OR ☒ does not include an animal deposit.
- Security deposit refund check will be by (Par. 4) (*check one*) ☒ one check jointly payable to all residents (default), OR ☐ one check payable to and mailed to _____
- # of keys/access devices (Par. 5) for _2_ unit, _1_ mailbox, ____ other _____ Gate Remote
- Your move-out notice will terminate Lease on (Par. 5): (*check one*) ☐ last day of month OR ☒ exact day designated in notice
- Check here ☐ if the dwelling is to be furnished (Par. 5)
- Check here ☐ if there is a concession addendum
- Rent to be paid (Par. 6): (*check all that apply*) ☒ at the onsite manager's office, ☒ through our online payment site, OR ☒ at www.RentCafe.com
- Check here if included in monthly rent: ☐ garage, ☐ storage, ☐ carport, ☐ washer/dryer, or ☐ other _____
- Total monthly rent (Par. 6) $ __864.00__
- Prorated rent (Par. 6) for (*check one*) ☒ first month OR ☐ second month $ __432.00__
- Late charges if rent is not paid on or before (Par. 6) __3rd__
- Initial late charge (Par. 6) $ __50.00__
- Daily late charge (Par. 6) $ __10.00__
- Returned-check charge (Par. 6) $ __50.00__
- Animal violation charges (Par. 6) Initial $ __100.00__ Daily $ __10.00__
- Monthly animal rent (if any) $ __15.00__
- Monthly pest control (if any) $ __1.00__
- Monthly trash / waste (if any) $ __4.00__
- Utilities paid by owner (Par. 7): (*check all that apply*) ☐ electricity, ☐ gas, ☐ water, ☐ wastewater, ☐ trash/recycling, ☐ cable/satellite, ☐ master antenna, ☐ Internet, ☐ stormwater/drainage, ☐ other _____
- Utility connection charge (Par. 12) $ __50.00__
- You are: (*check one*) ☒ required to buy insurance OR ☐ not required to buy insurance (Par. 8)
- Agreed reletting charge (Par. 10) $ __734.40__
- Special provisions (Par. 9): __If lease is not renewed, a $200 MTM fee will be charged each month. If proof of current $100,000 property liability insurance is not received by mgmt, a $75 risk assessment fee will be charged each month. No partial payments accepted.__

## Signatures and Attachments

**42. Attachments.** We will provide you with a copy of the Lease as required by statute. This may be in paper format, in an electronic format if you request it, or by e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease and given to you at signing. When an Inventory and Condition form is completed, both you and we should retain a copy. The items checked below are attached to and become a part of this Lease and are binding even if not initialed or signed.

- ☒ Access Gate Addendum
- ☐ Additional Special Provisions
- ☒ Allocation Addendum for: ☐ electricity ☒ water ☐ gas ☐ central system costs ☐ trash/recycling ☐ cable/satellite ☐ stormwater/drainage ☐ services/government fees
- ☒ Animal Addendum
- ☒ Apartment Rules or Community Policies
- ☐ Asbestos Addendum (if asbestos is present)
- ☒ Bed Bug Addendum
- ☐ Early Termination Addendum
- ☒ Enclosed Garage, Carport, or Storage Unit Addendum
- ☐ Intrusion Alarm Addendum
- ☒ Inventory & Condition Form
- ☐ Lead Hazard Information and Disclosure Addendum
- ☐ Lease Contract Guaranty (guaranties, if more than one)
- ☐ Legal Description of Apartment (optional, if rental term longer than one year)
- ☐ Military SCRA Addendum
- ☒ Mold Information and Prevention Addendum
- ☒ Move-Out Cleaning Instructions
- ☐ Notice of Intent to Move Out Form
- ☐ Parking Permit or Sticker (quantity: _____)
- ☐ Rent Concession Addendum
- ☒ Renter's or Liability Insurance Addendum
- ☐ Repair or Service Request Form
- ☒ Satellite Dish or Antenna Addendum
- ☐ Security Guidelines Addendum
- ☐ PUC Tenant Guide to Water Allocation
- ☐ Utility Submetering Addendum: ☐ electricity ☒ water ☐ gas
- ☒ Other __Smoke Detector Addendum__
- ☒ Other __Smoking Addendum__

**You are legally bound by this document. Please read it carefully.**
A facsimile or electronic signature on this Lease is as binding as an original signature.

Before submitting a rental application or signing a Lease, you may take a copy of these documents to review and/or consult an attorney.

Additional provisions or changes may be made in the Lease if agreed to in writing by all parties.

You are entitled to receive a copy of this Lease after it is fully signed. Keep it in a safe place.

This lease is the entire ageement between you and us. You are NOT relying on any oral representations.

**Resident or Residents** (*all sign below*)

| (Name of Resident) | Date signed |
|---|---|
| (Name of Resident) | Date signed |
| (Name of Resident) | Date signed |
| (Name of Resident) | Date signed |
| (Name of Resident) | Date signed |
| (Name of Resident) | Date signed |

**Owner or Owner's Representative** (*signing on behalf of owner*)

_____

# COMMUNITY POLICIES LEASE ADDENDUM

| Community Name: | Legacy @ Champion Forest | Apartment #: | 1081 |
| Resident' Names: | Regina Sophus | | |

1. This **Community Policies Lease Addendum** between the above Resident(s) and Legacy @ Champion Forest Apartment Homes shall be incorporated and made a part of the Lease Contract executed on _____ and shall renew with all Lease Renewal periods or extensions. The purpose of this Addendum is to express the community policies by which the Resident(s) are required to comply.

2. We are pleased that you have chosen to make your home with us. It is our desire to provide you with the highest quality living environment possible. Customer service is a key to the success of our community and the company nationwide; therefore, it is a priority to our management team. We will make every effort to come to an amicable solution.

3. **FAIR HOUSING STATEMENT:** All ComCapp communities are committed to compliance with all federal, state and local fair housing laws. The community policies are designed to provide for consistent and fair treatment of all residents, occupants and their guests in the spirit of these laws. All community policies apply to all residents, occupants and their guests. The staff at this community has a legal obligation to treat each individual in a consistent manner and will enforce all community policies in such a manner. We appreciate your cooperation and compliance with all the community policies contained herein and those posted on the community premises. All new residents in your apartment community meet the same non-discriminatory qualification standards based on income, employment, credit, rental and criminal history.

4. **IMPORTANT TELEPHONE NUMBERS:**
   a) Police / Fire / Emergency Medical Service (emergency): **911**
   b) Management Office: 281.301.3000
   c) 24-Hour Emergency Maintenance: 281.301.3000

5. **24-HOUR SERVICE PLEDGE:** Service is an important part of ComCapp's commitment to you. Therefore, ComCapp pledges that all Service Requests reported during normal workdays will be responded to within 24-hours. Emergency requests will receive immediate response. Emergencies are safety or health hazards, as defined in your Lease Contract. Requests made after 2 P.M. on Friday or on weekends, after hours and holidays will be addressed within 24-hours of the next scheduled "open" weekday. We are committed to making sure your needs are met quickly and efficiently. In order for us to keep the service guarantee, we must have access to your apartment home during normal business hours. We cannot be denied access during or after the 24-hours following your request. Your apartment and its contents must be properly maintained and you must be a resident in good standing. Any damage or abuse to the apartment, appliances, fixtures or other household equipment will result in the cancellation of our service guarantee. Inclement weather, natural disasters or other emergencies that affect large numbers of residents will temporarily suspend our 24-hour Service Guarantee. All service requests must be in writing; with the date service request is given to the community office. Faxed or e-mailed service requests will also be accepted.

6. **MOLD:** Mold is found virtually everywhere in our environment, both indoor and outdoors and in both new and old structures. Molds are part of the natural environment. Outdoors, molds play a part in nature by breaking down dead organic matter such as fallen leaves and dead trees, but indoors, mold growth should be avoided. Molds reproduce by means of tiny spores; the spores are invisible to the naked eye and float through outdoor and indoor air. Mold spores, like plant pollen spread through the air and are commonly transported by shoes, clothing and other materials. Mold may begin growing indoors when mold spores land on surfaces that are wet. There are many types of mold, and none of them will grow without water or moisture. Molds are usually not a problem indoors, unless mold spores land on a wet or damp spot and begin growing. There is conflicting scientific evidence as to what constitutes a sufficient accumulation of mold which could lead to adverse health effects. However, molds produce allergens, which are substances that can cause allergic reactions. Inhaling or touching mold or mold spores may cause allergic reactions in sensitive individuals. Allergic responses include hay fever-type symptoms, such as sneezing, runny nose, red eyes, and skin rash (dermatitis). Allergic reactions to mold are common. Symptoms other than the allergic type are not commonly identified as a result of exposure to mold.

   a) <u>PREVENTION-</u> It is impossible to get rid of all mold and mold spores indoors; some mold spores will be found floating through the air and in house dust. The mold spores will not grow if moisture is not present. Indoor mold growth can and should be prevented or controlled by controlling moisture. Therefore, in order to minimize the potential for mold growth in the dwelling, Resident agrees to do the following:

   - Use all air conditioning, in a reasonable manner and use heating systems in moderation and keep the premises properly ventilated by periodically opening windows to allow circulation of fresh air when the humidity level is less than 50% outside.
   - Keep the dwelling clean – particularly the kitchen, the bathroom(s), the carpets and floors. Regular vacuuming, mopping and using a household cleaner to clean hard surfaces is important to remove the household dirt and debris that harbor mold or food for mold. Immediately throw away moldy food.
   - Remove visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as reasonably possible.
   - Look for leaks in washing machine hoses and discharge lines – especially if the leak is large enough for water to infiltrate nearby walls.
   - Turn on any exhaust fans in the bathroom and kitchen before you start showering or cooking with open pots.
   - When showering, be sure to keep the shower curtain inside the tub or fully close the shower doors.
   - After taking a shower or bath, wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor, leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated and hang up your towels and bath mats so they will completely dry out.
   - Promptly notify management in writing about any signs of water leaks, water infiltration, visible mold or air conditioning or heating system problems.
   - Follow community rules, if any, regarding the replacement of air filters.
   - Management will respond in accordance with state law and the Lease Contract to repair or remedy the situation as necessary.

   b) <u>SMALL AREAS OF MOLD ON NON-POROUS SURFACES -</u> The federal Environmental Protection Agency (EPA) recommends first cleaning non-porous surfaces (such as ceramic tile, Formica, vinyl flooring, metal, wood or plastic) with soap or detergent and water. Let the surface dry, and then within 24-hours apply a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant®, Tilex Mildew Remover® or Clorox Clean Up®. Note that only a few of the common household cleaners will actually kill mold. Some cleaners contain bleach, which can discolor or stain, therefore be sure to follow the instructions on the container. Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface. Always clean and apply a biocide to an area 5-6 times larger than any visible mold because mold may be adjacent in quantities not yet visible to the naked eye. A vacuum cleaner with a high efficiency particulate air (HEPA) filter can be used to help remove non-visible mold products from porous items, such as fibers in sofas, chairs, drapes and carpets – provided the fibers are completely dry. Machine washing and drying will remove mold from clothes.

   c) <u>DO NOT CLEAN OR APPLY BIOCIDES TO</u> – Visible mold on porous surfaces, such as sheetrock walls or ceilings, or large areas of visible mold on non-porous surfaces. Instead, notify us in writing, and we will take appropriate action.

   d) <u>TERMINATION OF TENANCY</u> – We reserve the right to terminate the tenancy and you agree to vacate the premises in the event that we, in our sole judgment, feel that there is either mold or mildew present in the dwelling unit which may pose a financial

possess against you at law or in equity and you shall be liable to us for damages sustained as a result of your failure to comply with the terms of this addendum.

7. **SECURITY:** We realize that it may be particularly important for you to be aware of whom to contact in case you are in need of security services. Although it is regrettable that we live in a city in which protection from crime is a genuine concern. As you can appreciate, no one can ensure your safety; your security is the responsibility of the local law enforcement agency and yourself, therefore you should contact the local law enforcement agency for all of your security or safety needs. We **DO NOT** provide security. Any security measures that we may take are taken solely for the purpose of securing our property. There is **ABSOLUTELY NO GUARANTEE** that any efforts by us will in any way increase your personal security or the safety of your family or guests or their respective belongings. We do not take responsibility for any injury, damage or loss to person or property, whatsoever which is a result of any problem or failure of any security device, service or other measures or that which is caused by any other person including, but not limited to, theft, burglary, trespass, assault, rape, vandalism or any other crime. In the event that you may be in need of police protection of any kind, you should always contact the local law enforcement agency. Please keep this number in an easily accessible location. **IN THE EVENT OF AN EMERGENCY, YOU SHOULD CALL "911" WITHOUT DELAY;** do not contact the management office or answering service before contacting "911".

Houston Police Non Emergency Number    713.884.3131

We urge you to be as cautious as possible with respect to your property, person and surroundings. Upon your written request and at your cost, we will install a keyless interior night-lock. We also suggest that you contact your insurance agent and maintain insurance coverage for your own person, personal belongings and that of your guests, as we are not liable for any damages to the your person or property, occupants or guests. **We suggest that if possible you pay your rent on line through RentPayment.com.**

8. **GENERAL CONDUCT OF RESIDENT:** The conduct of you or your guests or occupants shall not be loud, obnoxious, or unlawful and shall not disturb the rights, comforts or conveniences of us, other residents or other persons in or near the Apartment community. Excessive noise or loud music in apartments or in common areas will not be permitted at any time. There shall be no loitering in any common areas of the community at any time. Persons under the age of 16 may not be outside of their apartment after 9:00 p.m. unless accompanied by a parent, guardian or other responsible adult.

9. **RESIDENT AMENITIES:** You must comply with all posted amenity-specific policies and hours of operation. Amenities are provided for the enjoyment of all residents. Read posted directions before operating any equipment. Proper use of the equipment is imperative to prevent abuse of the equipment and to keep it in proper working condition. Attendants are not provided unless otherwise posted. Your use of amenities is at your own risk; we are not responsible or liable for accidents or injuries. Children under the age of 18 must be accompanied by an adult 18 years of age or older who is responsible for the child. Pets are not permitted in any amenity area with the exception of registered assistant animals. Use plastic or paper containers only; glass containers are not permitted. Smoking is not permitted in indoor amenity areas. Please report any amenity problems or needed repairs to the management office so prompt action can be taken.

10. **SWIMMING POOL:** Each member of the party must have a Swimming Pool Pass. Passes will be assigned to apartments by Residents listed on the lease. Replacement for lost or broken passes will be $25. Passes must be worn by anyone over 24 months of age. Anyone not on the lease will not be able to receive a pass. Visitors are limited to two (2) per apartment and must be registered at the office. Visitors must be accompanied by resident at all times while using any amenity. Resident is responsible for their Visitor's actions.

11. **BARBECUE GRILLS:** Open flame cooking devices, including those using charcoal, propane, natural gas, wood and Hibachis, shall **not** be operated inside the apartment, on balconies or patios, or within 20-feet of any portion of the building. Propane tanks shall not be stored on patios or balconies or inside the apartment dwelling or storage unit. Local fire codes will be strictly enforced.

12. **INSECT TREATMENT:** You are required to allow extermination services to be performed on your apartment home at least four times per year as established by us.

13. **PETS:** Per the lease agreement non-aggressive pets; 50 pounds or less are allowed with a $400 Pet Fee per pet, plus $15 Pet Rent per month. Limit of TWO Pets per apartment. Residents must walk all pets in designated areas; all pets must be on a lease at all times; Owners MUST pickup after their animals. Fines will be accessed for failure to follow policy.

14. **KEYS/ACCESS DEVICES & LOCKS:** You may obtain a duplicate key for a minor charge of $5.00 per key. To have the lock re-keyed there is a charge of $25.00 per lock, which includes one key. During after hours lock out calls, we will only open the door for you or occupants listed in the Lease Contract and that have provided proper photo identification. We will assess a charge of $25.00 for afterhours lock out calls. Payment for such charges are required before the next rental due date and must be made to the management office during normal business hours.

15. **PACKAGE DELIVERY:** Packages are not accepted by the office. Please make arrangements to have your package delivered when you are home or delivered to an alternative address.

16. **DECORATING:** The staff at your community works very hard to maintain your community's attractive appearance. We ask that you assist us in the following ways:

   a) All window coverings must show a light background when viewed from outdoors. This restriction includes both drapes and blinds. Foil is not permitted in windows. Holiday decorations are allowed but must be removed within two weeks of the holiday.

   b) No structural changes or additions may be made to the exterior of the building, including patios and balconies. No alterations may be made to your front door or entrance to your apartment. We encourage you to use a doormat, but we will remove mats that are not designed for outdoor use such as carpet scraps or automobile mats. In addition, we will remove mats with offensive or inappropriate design or text.

   c) Since the appearance of patios and balconies affect the appearance of our community, patios and balconies may not be used for storage of trash, boxes, tires, auto parts, broken furniture, toys, etc. The management reserves the right to monitor the décor and appearance of your patio or balcony.

   d) Inside your apartment, you have the freedom to decorate by hanging pictures, etc., in accordance with the Lease Contract limitations. However, in order to receive a full refund of your security deposit, you must return the apartment in its original condition with the exception of reasonable wear and tear as defined by statute. If you fail to do so, you will be charged appropriately. You are responsible for any damages caused by water furniture.

17. **PARKING:** Your Apartment Lease Contract allows us to regulate the manner and time of all parking. Our obligations to all residents require that we apply these policies to benefit the greatest number of residents.

   a) <u>Non-Assigned Resident Parking</u> - All resident vehicles must be issued an assigned ComCapp parking sticker. The sticker must be applied to the lower windshield on the driver side. Each apartment home will be assigned one parking sticker per registered vehicle. All vehicles must be in running order with valid plates and state stickers; all vehicles must have proof of Liability Insurance. If a vehicle is parked on the community premises in an assigned or non-assigned parking space without proper identification, it is subject to being towed, at the vehicle owner's expense, with or without warning. This community ☐ does X does not have assigned parking, except for the Garages and Carports.

   b) <u>Visitor Parking</u> – We request that you direct visitors to park vehicles in designated visitor parking areas.

   c) <u>Recreational Vehicles and Motorcycle Parking</u> – Recreational Vehicles are not allowed to be parked on premises. Motorcycles may be parked in a parking space and must be registered at the office.

   d) <u>Parking Violations</u> - All vehicles that are parked on the community premises as follows may be subject to tow, at the vehicle owner's expense, with or without notice:

   > Vehicles parked in a handicap-designated space without a valid handicap placard, sticker or license plate displayed

   > Vehicles parked prohibiting garbage disposal trucks access to a dumpster

# COMMUNITY POLICIES LEASE ADDENDUM

| Community Parking Sticker # | Assigned Parking Space # If Applicable | | Vehicle Description | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Car/Truck/ SUV | Recreational Vehicle | License Plate | ST | Make/Model | Year | Color | Proof of Liability Insurance | |
| | | | | | | | | ☐ | |
| | | | | | | | | ☐ | |
| | | | | | | | | ☐ | |
| | | | | | | | | ☐ | |

18. **UTILITIES:** You agree to assume all electric service incurred throughout the term of the Lease Contract at the service address listed above. You understand that it is your sole responsibility to arrange this service with the utility company as of the move-in date. You agree to assume all costs associated with utilities from the move-in date until service has been established in your name. If you do not establish service in your name on your move in date, you will be charged a fee of $50, plus $25 per day for every day the service is not in your name. This community ☐ does X does not participate in a Water Conservation program for which a separate Lease Contract Addendum is required.

19. **SATELLITE DISHES:** Under a Federal Communications Commission order you have a limited right to install a satellite dish or receiving antenna on the leased premises and Rental-Housing Owners are allowed to impose reasonable restrictions relating to such installation. You are required to comply with the following restrictions as a condition of installing such equipment:

a) Number and Size – You may install only one satellite dish or receiving antenna on the leased premises. A satellite dish may not exceed one meter (3.3 feet) in diameter. An antenna may receive but not transmit signals.

b) Location - Location of the satellite dish or antenna is limited to (1) inside the designated dwelling, or (2) in an area outside the designated dwelling such as a balcony, patio, etc., of which you have exclusive use under the Lease Contract. Installation is not permitted on any parking area, roof, exterior wall, window, windowsill, fence or common area, or in an area that other that which you are allowed to use. A satellite dish or antenna may not protrude beyond the vertical and horizontal space that is leased to you for exclusive use.

c) Safety and Non-interference - The installation: (1) must comply with reasonable safety standards; (2) may not interfere with community cable, telephone or electrical systems or those of neighboring properties; (3) may not be connected to community telecommunication systems; and (4) may not be connected to community electrical system except by plugging into a 110-volt duplex receptacle. If the satellite dish or antenna is placed in a permitted outside area, it must be safely secured by one of two methods: (1) securely attaching it to a portable, heavy object such as a small slab of concrete; or (2) any other method approved by us. No other methods are allowed. We may require reasonable screening of the satellite dish or antenna by plants, etc., so long as it does not impair reception.

d) Signal Transmission from Exterior Dish or Antenna to Interior of Dwelling - Under the FCC order, you may not damage or alter the leased premises and may not drill holes through outside walls, door jams, windowsills, etc. If the satellite dish or antenna is located outside the designated dwelling (on a balcony, patio, etc.), the signals received by it may be transmitted to the interior of the designated dwelling only by the following methods: (1) running a "flat" cable under a door jam or windowsill in a manner that does not physically alter the premises and does not interfere with proper operation of the door or window; (2) running a traditional or flat cable through a pre-existing hole in the wall (that will not need to be enlarged to accommodate the cable); (3) connecting cables "through a windowpane" similar to how an external car antenna for a cellular phone can be connected to inside wiring by a device glued to either side of the window--without drilling a hole through the window, (4) wireless transmission of the signal from the satellite dish or antenna to a device inside the dwelling; or (5) any other method approved by us.

e) Workmanship - In order to assure safety, we must approve the strength and type of materials used for installation. A qualified person or company approved by management must conduct the installation. Owner's approval will not be unreasonably withheld.

f) Maintenance - You will have the sole responsibility for maintaining the satellite dish, antenna and all related equipment.

g) Damages - You must remove the satellite dish or antenna and other related equipment upon moving out of the dwelling. You must pay for any damages and for the cost of repairs or repainting that may be reasonably necessary to restore the leased premises to its condition prior to the installation of your satellite dish, antenna or related equipment.

h) Insurance - You must take full responsibility for the satellite dish or antenna and must provide us with evidence of liability insurance to protect against claims of personal injury and property damage to others, relating to the satellite dish or antenna. The insurance coverage must be $100,000 which is an amount reasonably determined by us to accomplish that purpose. You agree to hold us harmless and indemnify us against any of the above claims by others.

i) Security Deposit Increase - The security deposit indicated in the Lease Contract is increased by an additional sum of $100.00 in order to help protect us against possible repair costs, damages, or failure to remove at time of move-out. This security deposit does not imply a right to drill or otherwise alter the leased premises. We deem the additional security deposit to be a general security deposit for all purposes. Refund of the security deposit will be subject to the terms and conditions of the Lease Contract. The additional security deposit is not refundable before all residents surrender the premises, even if the satellite dish or antenna has been removed.

j) You may begin installation of the satellite dish or antenna only after the following has been completed:
➤ You provide us with written evidence of the liability insurance referred to in paragraph 8 of this addendum;
➤ You pay us any additional security deposit, as referred to in paragraph 9; and
➤ You receive our written approval of the person or company who will install the satellite dish or antenna.

20. **APARTMENT TRANSFERS:** Occasionally residents choose to transfer from one apartment to another within an apartment community or possibly to another ComCapp community. To become eligible for a transfer, you must meet the following criteria:
a) Be current on all monies owed to the community.
b) Have paid rent late no more than one time during the current lease term.
c) Have submitted no returned checks during the current lease term.
d) Qualify for the new apartment by meeting all requirements of the current ComCapp Statement of Rental Criteria.
e) Allow us to inspect the condition of the current apartment home, which must be found in good condition without damage.
All eligible residents must meet and agree to the following criteria:
f) Submit a completed ComCapp Resident's Notice of Intent to Vacate at least 30-days before the date of transfer.
g) You must pay a one-time, non-refundable Transfer Fee of $300.00 at the time of submitting the notice to vacate. This does not apply to transfers at the end of a Lease Contract.
h) You must pay the required security deposit for the new apartment home.
i) You must follow the instructions listed on the Move-out Instructions and Cleaning Charge List.
j) Upon vacating the premises and returning all keys, we will conduct a final move-out inspection and assess any applicable charges to be deducted from the security deposit. If charges are in excess of the amount of the security deposit, the customer must pay the charges within five (5) business days of transfer or rent payments made for the new apartment will first be applied to move-out charges, subsequently causing rent to be late and the accrual of late fees where applicable

# COMMUNITY POLICIES LEASE ADDENDUM

a) You must provide us with at least **60-days** written notice of your intention to vacate the apartment by completing and submitting the ComCapp Resident's Notice of Intent To Vacate form. The Early Lease Termination will be effective on the last day of the month following the expiration of the 60-day notice.

b) You must pay all monies due as described in the Lease Contract through the termination date.

c) You must reimburse all rental concessions provided to you during the most current Lease Contract. These sums must be paid no later than the date you vacate the apartment.

d) The sums due herein may not be deducted from the security deposit.

e) You must pay a non-refundable Termination Fee equal to 2.5 times a month's rent, which is due in full at the time you provide the Notice to Vacate. Payment must be in the form of certified funds made payable to the Community as named above.

**22. MOVE-OUT INSTRUCTIONS AND CLEANING CHARGE LIST:** The security deposit or disposition will be returned by mail to the forwarding address noted on the Resident's Notice of Intent To Vacate, subject to any deductions as required per the state statutes. **Please note: Deposit refunds cannot be picked up at the office.** The following requirements must be fulfilled in order to receive a full deposit refund:

a) Complete the full term of the lease.

b) Complete and submit a 60-day written notice on *ComCapp Resident's Notice of Intent To Vacate* form to the community manager as required in the Lease Contract. Verbal notices are not acceptable under any circumstance. Must include a forwarding address.

c) Follow the **MOVE-OUT CLEANING INSTRUCTIONS AND CHARGE LIST** below.

d) Return all keys, parking placards and/or access gate cards/controllers to the community office or rent will continue to be charged as per the Lease Contract.

e) Pay all outstanding charges, including delinquent rent and utility charges prior to vacating the apartment.

f) No damage of any kind can exist (except for normal wear and tear or that which was noted on the move-in condition form).

g) An inspection of the apartment will be made only after you have moved out completely and all keys have been returned. You may request to be present during the inspection by contacting the management office and scheduling an appointment. If after the inspection, the apartment does not meet the above requirements; charges will be assessed in accordance with the **MINIMUM** Charge List below. All move-out inspections are subject to the community manager's final approval, therefore, any verbal agreements made by our representative during a move-out inspection are not guaranteed.

h) If you have occupied the apartment longer than twelve months, painting and general carpet cleaning, within normal wear and tear condition, is included at no charge. There will be additional charges for stains and or other damages to the carpet or paint. Listed in the sections below are **minimal** cleaning and or replacement charges per item that will be deducted from your security deposit refund or charged to you if left unclean, missing or damaged. Please note that charges are not limited to only those listed below and may increase depending on the extent of the cleaning and or damages. **The amounts below may increase without notice to you.**

i) It is our policy to clean and deodorize the carpet upon move-out regardless if the pet was authorized or not. Damages including pet odor, deodorizing or repairs to the carpet, pad or sub-floor and other damages in the apartment (i.e.: torn blinds, scratched doors, etc.) are not considered normal wear and tear. These charges are not restricted or limited by length of residency. **If your apartment has to be cleaned by our staff, a Cleaning Trip Charge of $35 will be assessed in addition to any specific itemized charges. Additionally, a Utilities Charge of at least $5 will be assessed as an estimation of utilities consumed during cleanup for which you are liable.**

j) A charge of **$50.00** per trash bag of items removed and **$150.00** per bulk item (i.e.: items that are too large and heavy to fit in a normal trash bag) will be assessed. **Do not discard bulk items at the community trash receptacles, as the bulk item charge will still apply.**

k) General Items to be cleaned throughout the apartment -

| Item | Charge | | Item | Charge |
|---|---|---|---|---|
| ☐ A/C Vent Cover | $5 | | ☐ Switch Plate and Plug Plate | $2 |
| ☐ Baseboard | $5 | | ☐ Vacuum carpet | $20 per room |
| ☐ Ceiling Fan | $10 | | ☐ Wallpaper | $8 |
| ☐ Doors &Handle | $8 | | ☐ Window Covering | $7 |
| ☐ Light Fixture | $2 | | ☐ Window Sill | $4 |
| ☐ Sliding Glass Door (inside & out) | $5 | | ☐ Window (inside) | $5 |
| ☐ Sweep & mop linoleum floor | $15 per room | | ☐ Woodwork & Wall | $5 |

l) Kitchen Cleaning Charges -

| Item | Charge | | Item | Charge |
|---|---|---|---|---|
| ☐ Burner | $4 | | | |
| ☐ Cabinet & Drawer (inside & out) | $35 | | ☐ Oven | $45 |
| ☐ Defrost Refrigerator | $25 | | ☐ Oven Broiler | $10 |
| ☐ Dishwasher (inside & out) | $10 | | ☐ Oven Rack | $5 |
| ☐ Exhaust Hood | $8 | | ☐ Range | $15 |
| ☐ Garbage Disposal | $8 | | ☐ Refrigerator (inside & out) | $45 |
| | | | ☐ Sink & Hardware | $15 |

m) Bathroom Cleaning Charges -

| Item | Charge | | Item | Charge |
|---|---|---|---|---|
| ☐ Cabinet & Drawer (inside & out) | $8 | | ☐ Sink/Tub/Shower Faucet Hardware | $10 |
| ☐ Exhaust Vent/Fan | $5 | | ☐ Toilet (inside & out) | $20 |
| ☐ Mirror | $5 | | ☐ Tub/Shower Surround | $35 |

n) Repair & Replacement Charges -

| Item | Charge | | Item | Charge |
|---|---|---|---|---|
| ☐ Broiler Pan | $25 | | ☐ Refrigerator Shelf/Bin | $35 |
| ☐ Cabinet Door/Drawer | $40 | | ☐ Showerhead | $15 |
| ☐ Carpet | $15 yard | | ☐ Shutter | $50 |
| ☐ Common Area, Door, Mailbox Key Replacement | $15 | | ☐ Sliding Closet Door Panel | $40+ |
| ☐ Door or Mail Box Lock Change | $30 | | ☐ Sliding Glass Door | $220+ |
| ☐ Entry Door | $150 | | ☐ Sliding Screen Door | $70 |
| ☐ Interior Door | $100 | | ☐ Smoke Detector, Fire Extinguisher | $45 |
| ☐ Ice Tray | $5 | | ☐ Stove Burner Ring | $25 |
| ☐ Light Fixture | $30+ | | ☐ Stovetop Drip Pan | $10 |
| ☐ Light Bulb | $5 | | ☐ Switch/Plug Plate | $5 |
| ☐ Linoleum | $12-$15 yard | | ☐ Thermostat | $80 |
| ☐ Mini Blind | $40 | | ☐ Toilet Paper Holder | $8 |
| ☐ Mirror | $45 | | ☐ Toilet Seat | $25 |
| ☐ Oven Rack | $18 | | ☐ Towel Bar | $20 |
| ☐ Pad | $5 yard | | ☐ Vertical Blind | $95 |
| ☐ Parking Placard | $25 | | ☐ Window (approximately) | $95 |
| | | | ☐ Window Screen | $35 |

# COMMUNITY POLICIES LEASE ADDENDUM

**22. Acknowledgement:** All parties acknowledge by their signature below that they have read and agree to all provisions of this Community Policies Lease Addendum.

**Resident Signature(s)**

**Date**

_____     _____

_____     _____

_____     _____

_____     _____

**Owner's Representative**

**Date**

_____     _____



**TEXAS APARTMENT ASSOCIATION**

**M E M B E R**

# Animal Addendum

Date of Lease: **January 9, 2015**
(when the Lease is filled out)

> *Please note: We consider animals a serious responsibility and a risk to each resident in the dwelling. If you do not properly control and care for an animal, you'll be liable if it causes damage or disturbs other residents.*

**1. Dwelling Unit.**

Unit # _____ 1027 _____

at _____ 4200 Cypress Creek Pkwy _____ (street address)

in _____ Houston _____ (city),

Texas _____ 77068 _____ (zip code).

**2. Lease Contract.**

Lease Contract date: _____ January 9, 2015 _____

Owner's name: ComCapp Timberstone LLC

Residents (list all residents): Regina Sophus

**3. Conditional Authorization for Animal.** You may keep the animal or animals described below in the dwelling until the Lease Contract expires. We may terminate this authorization sooner if your right of occupancy is lawfully terminated or if in our judgment you, your animal, your guest, or any occupant violates any of the rules in this addendum.

**4. Animal Deposit.** You must pay a one-time animal deposit of $_____ 0.00 _____ when you sign this addendum. This deposit adds to your total security deposit under the Lease Contract, and we consider that total balance a general security deposit for all purposes. Refund of the total security deposit is subject to the terms and conditions in the Lease Contract, and this animal-deposit portion of the total deposit is not separately refundable even if the animal is removed.

**5. Assistance or Service Animals.** When allowed by applicable laws, we may require written verification of or make other inquiries regarding the disability-related need for an assistance or service animal for a person with a disability. We will not charge an animal deposit, additional rent, or other fee for any authorized assistance or service animal. Except as provided by applicable law, all other provisions of this addendum apply to assistance or service animals.

**6. Search and Rescue Dogs.** We may ask the handler of a search and rescue dog for proof he or she is a person with a certification issued by a nationally recognized search and rescue agency before we authorize a search and rescue dog. If we authorize a search and rescue dog, we will not charge an animal deposit, additional rent or other fee for any such dog. Except as provided by applicable law, all other provisions of this addendum apply to search and rescue dogs.

**7. Additional Monthly Rent.** Your total monthly rent (as stated in the Lease Contract) will be increased by $_____ 15.00 _____.

**8. Additional Fee.** You must also pay a one-time nonrefundable fee of $_____ 400.00 _____ to keep the animal in the dwelling unit. The fee is due when you sign this addendum.

**9. Liability Not Limited.** The additional monthly rent and additional security deposit under this Animal Addendum do not limit residents' liability for property damage, cleaning, deodorization, de-fleaing, replacements, or personal injuries.

**10. Description of Animal.** You may keep only the animal or animals

Color: _____
Weight: _____
Age: _____
City of license: _____
License #: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____
Age: _____
City of license: _____
License #: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____

**11. Special Provisions.** The following special provisions control over any conflicting provisions of this addendum:

Pet must be on leash at all times outside of the apartment. Properly dispose of pet waste when inside/ outside of apartment. Pet must not be left on/in patio/balcony/garage unsupervised at any time. Violations are $50 per incident.

**12. Emergency.** In an emergency involving an accident or injury to your animal, we have the right—but not the duty—to take the animal to the following veterinarian for treatment, at your expense.

Doctor: _____
Address: _____
City/State/Zip: _____
Phone: (_____) _____

**13. Animal Rules.** You are responsible for the animal's actions at all times. You agree to follow these rules:

**13.1 Shots and Licenses.** The animal at all times must have current rabies shots and licenses required by law. You must show us evidence of the shots and licenses if we ask.

**13.2 Disturbances.** The animal must not disturb the neighbors or other residents, regardless of whether the animal is inside or outside the dwelling.

**13.3 Housebreaking, Cages, Offspring.** Dogs, cats, assistance or service animals, and search and rescue dogs must be housebroken. All other animals must be caged at all times. No animal offspring are allowed.

**13.4 Indoor Waste Areas.** Inside, the animal may urinate or def-

**13.7 Off-Limit Areas.** You must not let an animal—other than an assistance or service animal—into swimming-pool areas, laundry rooms, offices, clubrooms, other recreational facilities, or other dwelling units besides your own, except that search and rescue dogs shall be allowed to use areas of the property accessible to the general public, such as the leasing office. Certain service animals in training shall also be allowed to use those areas when accompanied by an approved trainer.

**13.8 Food & Water.** Your animal must be fed and given water inside the dwelling unit. You may not leave animal food or water outside the dwelling unit at any time, except in fenced yards (if any) for your exclusive use.

**13.9 Leash.** You must keep the animal on a leash and under your supervision when outside the dwelling or in any private fenced area. We or our representative may pick up unleashed animals, report them to the proper authorities, or do both. We'll charge you a reasonable fee for picking up and keeping unleashed animals.

**13.10 Animal Waste.** Unless we have designated a particular area in your dwelling unit or on the grounds for animal defecation and urination, you are prohibited from letting an animal defecate or urinate anywhere on our property and you must take the animal off our property for that purpose. If we allow animal defecation inside the unit, you must ensure that it's done in a litter box with a kitty-litter-type mix. If the animal defecates anywhere on our property (including in a fenced yard for your exclusive use), you must immediately remove the waste and repair any damage. In addition to the terms of this addendum, you must comply with all local ordinances regarding animal defecation.

**14. Additional Rules.** We may make reasonable changes to the animal rules from time to time if we distribute a written copy of any changes to every resident who is allowed to have animals.

**15. Violation of Rules.** If you, your guest, or any occupant violates any rule or provision of this addendum (in our judgment) and we give you written notice of the violation, you must remove the animal immediately and permanently from the premises. We also have all other rights and remedies set forth in paragraph 27 of the Lease Contract, including eviction and recovering damages and attorney's fees from you.

**16. Complaints About Animal.** If we receive a reasonable complaint from a neighbor or other resident or if we, in our sole discretion, determine that the animal has disturbed neighbors or other residents, we will give you written notice and you must immediately and permanently remove the animal from the premises.

**17. Our Removal of an Animal.** In some circumstances, we may enter the dwelling unit and remove the animal within one day after leaving a written notice in a conspicuous place.

**17.1 Causes for Removal.** We can remove an animal under this paragraph if, in our sole judgment, you have:
(A) abandoned the animal;
(B) left the animal in the dwelling unit for an extended period of time without food or water;
(C) failed to care for a sick animal;
(D) violated our animal rules; *OR*
(E) let the animal defecate or urinate where it's not allowed.

**17.2 Removal Process.** To remove an animal, we must follow the procedures in paragraphs 27 and 28 of the Lease Contract, and we may turn the animal over to a humane society or local authority. We'll return the animal to you upon request if we haven't already turned it over to a humane society or local authority. We don't have a lien on the animal for any purpose, but you must pay for reasonable care and kenneling charges for the animal. If you don't pick up the animal within five days after we remove it, it will be considered abandoned.

**18. Liability for Damage, Injuries, Cleaning.** Except for reasonable wear and tear resulting from an assistance or service animal, you and all co-residents are jointly and severally liable for the entire amount of any damage the causes, including cleaning, defleaing, or deodorizing. This provision applies to all parts of the dwelling unit including carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, and appliances, as well as landscaping and other outside improvements. If an item cannot be satisfactorily cleaned or repaired, you must pay for us to replace it. Payment for damage, repairs, cleaning, replacements, and the like are due immediately upon demand. As the owner, you're strictly liable for the entire amount of any injury that your animal causes to another person or to anyone's property. You indemnify us for all costs of litigation and attorney's fees resulting from any such injury or damage.

**19. Move-Out.** Except for reasonable wear and tear resulting from an assistance or service animal, when you move out, you'll pay for defleaing, deodorizing, and shampooing to protect future residents from possible health hazards, regardless of how long the animal was there. We—not you—will arrange for these services.

**20. Multiple Residents.** Each resident who signed the Lease Contract must also sign this addendum. You, your guests, and any occupants must follow all animal rules. Each resident is jointly and severally liable for damages and all other obligations set forth in this addendum, even if the resident does not own the animal.

**21. Dog Park.** We may provide an area to be used as a dog park. While using the park, you will be required to supervise your dog, but may remove the leash. Leashes must be used while traveling to and from the park. The park is not supervised or monitored in any way, and you use the park at your own risk. We are not liable for any injury, damage or loss which is caused as a result of any problem, defect or malfunction of the park. We are also not liable for injury, damage or loss to any person, animal or property caused by any other person or animal, including, but not limited to, dog bite, trespass, assault or any other crime. Furthermore, we are not liable for any disruption in the park's operation or performance. You hereby release us and our agents, contractors, employees and representatives from any liability connected with the park. You agree to be responsible for any property damage caused by you, your guests or other occupants to the park. You understand that participating in any activity at the park carries a risk of injury, and you are willing to assume this risk. We make no representations or warranties of any kind regarding the park.

**22. General.** You acknowledge that no other oral or written agreement exists regarding animals. Except for any special provisions noted in paragraph 11 above, our representative has no authority to modify this addendum or the animal rules except in writing as described under paragraph 14. This Animal Addendum and the animal rules are considered part of the Lease Contract described above.

---

## You are legally bound by this document. Please read it carefully.

### Resident or Residents *(all sign below)*

(Name of Resident)                                  Date signed

(Name of Resident)                                  Date signed

(Name of Resident)                                  Date signed

(Name of Resident)                                  Date signed

(Name of Resident)                                  Date signed

### Owner or Owner's Representative *(sign below)*

                                                    Date signed



# Mold Information and Prevention Addendum

Date of Lease: __January 9, 2015__
(when the Lease is filled out)

> *Please note: We want to maintain a high-quality living environment for our residents. To help achieve this goal, it is important that we work together to minimize any mold growth in your dwelling. This addendum contains important information for you, and responsibilities for both you and us.*

**1. Addendum.** This is an addendum to the Lease Contract executed by you, the resident or residents, on the dwelling you have agreed to rent.

That dwelling is: Unit # _____1027_____

at __ComCapp Timberstone LLC__ _____

_____

*(name of apartments)*

or other dwelling located at _____

_____

_____

*(street address of house, duplex, etc.)*

City/State/Zip where dwelling is located: _____

_____

**2. About Mold.** Mold is found everywhere in our environment, both indoors and outdoors and in both new and old structures. Molds are nothing new—they are natural microscopic organisms that reproduce by spores. They have always been with us. In the environment, molds break down organic matter and use the end product for food. Without molds we would all be struggling with large amounts of dead organic matter. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing, and other materials. Mold can grow inside a dwelling when excess moisture is present. There is conflicting scientific evidence about how much mold must accumulate before it creates adverse health effects on people and animals. Even so, we must take appropriate precautions to prevent its buildup.

**3. Preventing Mold Begins with You.** To minimize the potential for mold growth in your dwelling, you must:

- Keep your dwelling clean—particularly the kitchen, the bathrooms, carpets, and floors. Regular vacuuming and mopping of floors, plus cleaning hard surfaces using a household cleaner, are all important to remove the household dirt and debris that harbor mold or food for mold. Throw away moldy food immediately.

- Remove visible moisture accumulations on windows, walls, ceilings, floors, and other surfaces as soon as reasonably possible. Look for leaks in washing-machine hoses and discharge lines—especially if the leak is large enough for water to seep into nearby walls. If your dwelling has them, turn on exhaust fans in the bathroom before showering and in the kitchen before cooking with open pots. Also when showering, keep the shower curtain inside the tub (or fully close the shower doors). Experts also recommend that after a shower or bath you (1) wipe moisture off shower walls, shower doors, the bathtub, and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out.

- Promptly notify us in writing about any air-conditioning or heating-system problems you discover. Follow any of our rules about replacing air filters. It's also good practice to open windows and doors periodically on days when the outdoor weather is dry (i.e., humidity is below 50%) to help humid areas of your dwelling dry out.

- Promptly notify us in writing of any signs of water leaks, water infiltration, or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation as necessary.

**4. Avoiding Moisture Buildup.** To avoid mold growth, it's important to prevent excess moisture buildup in your dwelling. Failing to promptly attend to leaks and moisture accumulations on dwelling surfaces can encourage mold growth, especially in places where they might get inside walls or ceilings. Prolonged moisture can come from a wide variety of sources, such as:

- rainwater leaking from roofs, windows, doors, and outside walls, as well as flood waters rising above floor level;

- overflows from showers, bathtubs, toilets, sinks, washing machines, dehumidifiers, refrigerator or air-conditioner drip pans, or clogged air-conditioner condensation lines;

- leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting or caulking around showers, bathtubs, or sinks;

- washing-machine hose leaks, plant-watering overflows, pet urine, cooking spills, beverage spills, and steam from excessive open-pot cooking;

- leaks from clothes-dryer discharge vents (which can put a lot of moisture into the air); and

- insufficient drying of carpets, carpet pads, shower walls, and bathroom floors.

**5. Cleaning Mold.** If small areas of mold have already accumulated on nonporous surfaces (such as ceramic tile, formica, vinyl flooring, metal, wood, or plastic), the Environmental Protection Agency recommends that you first clean the areas with soap (or detergent) and water and let the surface dry thoroughly. (Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.) When the surface is dry—and within 24 hours of cleaning—apply a premixed spray-on household biocide such as Lysol Disinfectant*, Original Pine-Sol* Cleaner, Tilex Mold & Mildew Remover* or Clorox* Clean-up* Cleaner + Bleach. (Note two things: First, only a few of the common household cleaners can actually kill mold. Second, Tilex and Clorox contain bleach, which can discolor or stain surfaces, so follow the instructions on the container.) Always clean and apply a biocide to an area five or six times larger than any mold you see—mold can be present but not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air (HEPA) filter can be used to help remove nonvisible mold products from porous items such as fibers in sofas, chairs, drapes, and carpets—provided the fibers are completely dry. Machine washing or dry-cleaning will remove mold from clothes.

**6. Warning for Porous Surfaces and Large Surfaces.** Do not clean or apply biocides to visible mold on porous surfaces such as sheetrock walls or ceilings or to large areas of visible mold on nonporous surfaces. Instead, notify us in writing and we will take appropriate action to comply with Section 92.051 et seq. of the Texas Property Code, subject to the special exceptions for natural disasters.

**7. Compliance.** Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions about this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

**If you fail to comply with this addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.**

---

**Resident or Residents** *(all sign below)*

**Owner or Owner's Representative** *(sign below)*

(Name of Resident) _____ Date signed

_____ Date signed

(Name of Resident) _____ Date signed

(Name of Resident)

# LEASE ADDENDUM FOR
# ALLOCATING WATER/WASTEWATER COSTS

1. **Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. **1027** in the **ComCapp Timberstone LLC** _____ Apartments in **Houston**, Texas.

2. **Reason for allocation.** When water and wastewater bills are paid 100 percent by the property owner, residents have no incentive to conserve water. This results in a waste of our state's natural resources and adds to the overhead of the property--and that usually means higher rents. Allocation of water bills saves money for residents because it encourages them to conserve water and wastewater. We as owners also have incentive to conserve because we are required by law to pay a portion of the total water bill(s) for the entire apartment community.

3. **Your payment due date.** Payment of your allocated water/wastewater bill is due 16 days after the date it is postmarked or hand delivered to your apartment. You agree to mail or deliver payment to the place indicated on your bill so that payment is received no later than the due date. You will pay a late charge of 5 percent of your water/wastewater bill if we don't receive timely payment. If you are late in paying the water bill, we may not cut off your water; but we may immediately exercise all other lawful remedies, including eviction--just like late payment of rent.

4. **Allocation procedures.** Your monthly rent under the TAA Lease Contract does *not* include a charge for water and wastewater. Instead, you will be receiving a separate bill from us each month for such utilities. We may include this item as a separate and distinct charge as part of a multi-item bill. We will allocate the monthly mastermeter water/wastewater bill(s) for the apartment community, based on an allocation method approved by the Public Utility Commission of Texas (PUC) and described below.

The allocation method that we will use in calculating your bill is noted below and described in the following subdivision of Section 24.124 of the PUC rules *(check only one)*:

- ☐ subdivision (i)   actual occupancy;
- ☐ subdivision (ii)   ratio occupancy (PUC average for number of occupants in unit);
- ☐ subdivision (iii)   average occupancy (PUC avg. for no. of bedrooms in unit);
- ☒ subdivision (iv)   combination of occupancy and square feet of the apartment; or
- ☐ subdivision (v)   submetered hot/cold water, ratio to total.

The normal date on which the utility company sends its monthly bill to us for the water/wastewater mastermeter is about the _____ day of the month. Within 10 days thereafter, we will try to allocate that mastermeter bill among our residents by allocated billings.

5. **Common area deduction.** We will calculate your allocated share of the mastermetered water/wastewater bill according to PUC rules. Before calculating your portion of the bill, we will deduct for irrigation of landscaping and all other common area uses, as required by PUC rules. We will also deduct for any utility company base charges and customer service charges so that you won't be paying any part of such charges for vacant units. No administrative or other fees will be added to the total mastermeter water/wastewater bill(s) to be allocated unless expressly allowed by PUC rules. No other amounts will be included in the bill except your unpaid balances and any late fees you incur. If we fail to pay our mastermeter bill to the utility company on time and incur penalties or interest, no portion of such amounts will be included in your bill.

6. **Change of allocation formula.** The above allocation formula for determining your share of the mastermetered water/wastewater bill cannot be changed except as follows: (1) the new formula is one approved by th PUC; (2) you receive notice of the new formula at least 35 days before it takes effect; and (3) you agree to the change in a signed lease renewal or signed mutual agreement.

7. **Previous average.** As required under PUC rules, you are notified that the average monthly bill for all dwelling units in the previous calendar year was $ **34.50** per unit, varying from $ **35.00** to $ **75.00** for the lowest to highest month's bills for any unit in the apartment community for this period, if such information is available. The above amounts do not reflect future changes in utility company water rates, weather variations, total water consumption, residents' water consumption habits, etc.

8. **Right to examine records.** During regular weekday office hours, you may examine: (1) our water/wastewater bills from the utility company; (2) our calculations of your monthly allocations; and (3) any other information available to you under PUC rules. Please give us reasonable advance notice to gather data. Any disputes relating to the computation of your bill will be between you and us.

9. **PUC.** Water allocation billing is regulated by the PUC. A copy of the rules is attached. This addendum complies with those rules.

10. **Conservation efforts.** We agree to use our best efforts to repair any water leaks inside or outside your apartment no later than 7 days after learning of them. You agree to use your best efforts to conserve water and notify us of leaks.

**Resident or Residents**
*(All residents must sign here)*

Regina Sophus

**Owner or Owner's Representative**
*(Signs here)*

**Date of Lease Contract**

**January 9, 2015**

Attached: Copy of PUC water billing rules

# Water allocation and submetering is regulated by the Texas Public Utility Commission (PUC). In accordance with PUC rules, a copy of the applicable rules are provided to you below:

## SUBCHAPTER H: WATER UTILITY SUBMETERING AND ALLOCATION

### §24.121. General Rules and Definitions.

(a) Purpose and scope. The provisions of this subchapter are intended to establish a comprehensive regulatory system to assure that the practices involving submetered and allocated billing of dwelling units and multiple use facilities for water and sewer utility service are just and reasonable and include appropriate safeguards for tenants.

(b) Application. The provisions of this subchapter apply to apartment houses, condominiums, multiple use facilities, and manufactured home rental communities billing for water and wastewater utility service on a submetered or allocated basis.

(c) Definitions. The following words and terms, when used in this subchapter, have the following meanings, unless the context clearly indicates otherwise.

   (1) Allocated utility service - Water or wastewater utility service that is master metered to an owner by a retail public utility and allocated to tenants by the owner.

   (2) Apartment house - A building or buildings containing five or more dwelling units that are occupied primarily for nontransient use, including a residential condominium whether rented or owner occupied, and if a dwelling unit is rented, having rental paid at intervals of one month or longer.

   (3) Customer service charge - A customer service charge is a rate that is not dependent on the amount of water used through the master meter.

   (4) Dwelling unit - One or more rooms in an apartment house or condominium, suitable for occupancy as a residence, and containing kitchen and bathroom facilities; a unit in a multiple use facility; or a manufactured home in a manufactured home rental community.

   (5) Dwelling unit base charge - A flat rate or fee charged by a retail public utility for each dwelling unit recorded by the retail public utility.

   (6) Master meter - A meter used to measure, for billing purposes, all water usage of an apartment house, condominium, multiple use facility, or manufactured home rental community, including common areas, common facilities, and dwelling units.

   (7) Manufactured home rental community - A property on which spaces are rented for the occupancy of manufactured homes for nontransient residential use and for which rental is paid at intervals of one month or longer.

   (8) Multiple use facility - A commercial or industrial park, office complex, or marina with five or more units that are occupied primarily for nontransient use and are rented at intervals of one month or longer.

   (9) Occupant - A tenant or other person authorized under a written agreement to occupy a dwelling.

   (10) Owner - The legal titleholder of an apartment house, a manufactured home rental community, or a multiple use facility; a condominium association; or any individual, firm, or corporation that purports to be the landlord of tenants in an apartment house, manufactured home rental community, or multiple use facility.

   (11) Point-of-use submeter - A device located in a plumbing system to measure the amount of water used at a specific point of use, fixture, or appliance, including a sink, toilet, bathtub, or clothes washer.

   (12) Submetered utility service - Water utility service that is master metered for the owner by the retail public utility and individually metered by the owner at each dwelling unit; wastewater utility service based on submetered water utility service; water utility service measured by point-of-use submeters when all of the water used in a dwelling unit is measured and totaled; or wastewater utility service based on total water use as measured by point-of-use submeters.

   (13) Tenant - A person who owns or is entitled to occupy a dwelling unit or multiple1 use facility unit to the exclusion of others and, if rent is paid, who is obligated to pay for the occupancy under a written or oral rental agreement.

   (14) Utility service - For purposes of this subchapter, utility service includes only drinking water and wastewater.

### §24.122. Owner Registration and Records.

(a) Registration. An owner who intends to bill tenants for submetered or allocated utility service or who changes the method used to bill tenants for utility service shall register with the commission in a form prescribed by the commission.

(b) Water quantity measurement. Except as provided by subsections (c) and (d)

construction began after January 1, 2003, shall provide for the measurement of the quantity of water, if any, consumed by the occupants of each unit through the installation of:

   (1) submeters, owned by the property owner or manager, for each dwelling unit or rental unit; or

   (2) individual meters, owned by the retail public utility, for each dwelling unit or rental unit.

(c) Plumbing system requirement. An owner of an apartment house on which construction began after January 1, 2003, and that provides government assisted or subsidized rental housing to low or very low income residents shall install a plumbing system in the apartment house that is compatible with the installation of submeters for the measurement of the quantity of water, if any, consumed by the occupants of each unit.

(d) Installation of individual meters. On the request by the property owner or manager, a retail public utility shall install individual meters owned by the utility in an apartment house, manufactured home rental community, multiple use facility, or condominium on which construction began after January 1, 2003, unless the retail public utility determines that installation of meters is not feasible. If the retail public utility determines that installation of meters is not feasible, the property owner or manager shall install a plumbing system that is compatible with the installation of submeters or individual meters. A retail public utility may charge reasonable costs to install individual meters.

(e) Records. The owner shall make the following records available for inspection by the tenant or the commission or commission staff at the on-site manager's office during normal business hours in accordance with subsection (g) of this section. The owner may require that the request by the tenant be in writing and include:

   (1) a current and complete copy of TWC, Chapter 13, Subchapter M;

   (2) a current and complete copy of this subchapter;

   (3) a current copy of the retail public utility's rate structure applicable to the owner's bill;

   (4) information or tips on how tenants can reduce water usage;

   (5) the bills from the retail public utility to the owner;

   (6) for allocated billing:

     (A) the formula, occupancy factors, if any, and percentages used to calculate tenant bills;

     (B) the total number of occupants or equivalent occupants if an equivalency factor is used under §24.124(e)(2) of this title (relating to Charges and Calculations); and

     (C) the square footage of the tenant's dwelling unit or rental space and the total square footage of the apartment house, manufactured home rental community, or multiple use facility used for billing if dwelling unit size or rental space is used;

   (7) for submetered billing:

     (A) the calculation of the average cost per gallon, liter, or cubic foot;

     (B) if the unit of measure of the submeters or point-of-use submeters differs from the unit of measure of the master meter, a chart for converting the tenant's submeter measurement to that used by the retail public utility;

     (C) all submeter readings; and

     (D) all submeter test results;

   (8) the total amount billed to all tenants each month;

   (9) total revenues collected from the tenants each month to pay for water and wastewater service; and

   (10) any other information necessary for a tenant to calculate and verify a water and wastewater bill.

(f) Records retention. Each of the records required under subsection (e) of this section shall be maintained for the current year and the previous calendar year, except that all submeter test results shall be maintained until the submeter is permanently removed from service.

(g) Availability of records

   (1) If the records required under subsection (e) of this section are maintained at the on-site manager's office, the owner shall make the records available for inspection at the on-site manager's office within three days after receiving a written request.

   (2) If the records required under subsection (e) of this section are not routinely maintained at the on-site manager's office, the owner shall provide copies of the records to the on-site manager within 15 days of receiving a written request from a tenant or the commission or commission staff.

within 30 days of the owner receiving a written request from the tenant.

(4) Copies of the records may be provided by mail if postmarked by midnight of the last day specified in paragraph (1), (2), or (3) of this subsection.

## §24.123. Rental Agreement.

(a) Rental agreement content. The rental agreement between the owner and tenant shall clearly state in writing:

(1) the tenant will be billed by the owner for submetered or allocated utility services, whichever is applicable;

(2) which utility services will be included in the bill issued by the owner;

(3) any disputes relating to the computation of the tenant's bill or the accuracy of any submetering device will be between the tenant and the owner;

(4) the average monthly bill for all dwelling units in the previous calendar year and the highest and lowest month's bills for that period;

(5) if not submetered, a clear description of the formula used to allocate utility services;

(6) information regarding billing such as meter reading dates, billing dates, and due dates;

(7) the period of time by which owner will repair leaks in the tenant's unit and in common areas, if common areas are not submetered;

(8) the tenant has the right to receive information from the owner to verify the utility bill; and

(9) for manufactured home rental communities and apartment houses, the service charge percentage permitted under §24,1 24(d)(3) (related to Charges and Calculations) of this title that will be billed to tenants.

(b) Requirement to provide rules. At the time a rental agreement is discussed, the owner shall provide a copy of this subchapter or a copy of the rules to the tenant to inform the tenant of his rights and the owner's responsibilities under this subchapter.

(c) Tenant agreement to billing method changes. An owner shall not change the method by which a tenant is billed unless the tenant has agreed to the change by signing a lease or other written agreement. The owner shall provide notice of the proposed change at least 35 days prior to implementing the new method.

(d) Change from submetered to allocated billing. An owner shall not change from submetered billing to allocated billing, except after receiving written approval from the commission after a demonstration of good cause and if the rental agreement requirements under subsections (a), (b), and (c) of this section have been met. Good cause may include:

(1) equipment failures; or

(2) meter reading or billing problems that could not feasibly be corrected.

(e) Waiver of tenant rights prohibited. A rental agreement provision that purports to waive a tenant's rights or an owner's responsibilities under this subchapter is void.

## §24.124. Charges and Calculations.

(a) Prohibited charges. Charges billed to tenants for submetered or allocated utility service may only include bills for water or wastewater from the retail public utility and must not include any fees billed to the owner by the retail public utility for any deposit, disconnect, reconnect, late payment, or other similar fees.

(b) Dwelling unit base charge. If the retail public utility's rate structure includes a dwelling unit base charge, the owner shall bill each dwelling unit for the base charge applicable to that unit. The owner may not bill tenants for any dwelling unit base charges applicable to unoccupied dwelling units.

(c) Customer service charge. If the retail public utility's rate structure includes a customer service charge, the owner shall bill each dwelling unit the amount of the customer service charge divided by the total number of dwelling units, including vacant units, that can receive service through the master meter serving the tenants.

(d) Calculations for submetered utility service. The tenant's submetered charges must include the dwelling unit base charge and customer service charge, if applicable, and the gallonage charge and must be calculated each month as follows:

(1) water utility service: the retail public utility's total monthly charges for water service (less dwelling unit base charges or customer service charges, if applicable), divided by the total monthly water consumption measured by the retail public utility to obtain an average water cost per gallon, liter, or cubic foot, multiplied by the tenant's monthly consumption or the volumetric rate charged by the retail public utility

to the owner multiplied by the tenant's monthly water consumption;

(2) wastewater utility service: the retail public utility's total monthly charges for wastewater service (less dwelling unit base charges or customer service charges, if applicable), divided by the total monthly water consumption measured by the retail public utility, multiplied by the tenant's monthly consumption or the volumetric wastewater rate charged by the retail public utility to the owner multiplied by the tenant's monthly water consumption;

(3) service charge for manufactured home rental community or the owner or manager of apartment house: a manufactured home rental community or apartment house may charge a service charge in an amount not to exceed 9% of the tenant's charge for submetered water and wastewater service, except when:

(A) the resident resides in a unit of an apartment house that has received an allocation of low income housing tax credits under Texas Government Code, Chapter 2306, Subchapter DD; or

(B) the apartment resident receives tenant-based voucher assistance under United States Housing Act of 1937 Section 8, (42 United States Code,§ 1437f); and

(4) final bill on move-out for submetered service: if a tenant moves out during a billing period, the owner may calculate a final bill for the tenant before the owner receives the bill for that period from the retail public utility. If the owner is billing using the average water or wastewater cost per gallon, liter, or cubic foot as described in paragraph (1) of this subsection, the owner may calculate the tenant's bill by calculating the tenant's average volumetric rate for the last three months and multiplying that average volumetric rate by the tenant's consumption for the billing period.

(e) Calculations for allocated utility service.

(1) Before an owner may allocate the retail public utility's master meter bill for water and sewer service to the tenants, the owner shall first deduct:

(A) dwelling unit base charges or customer service charge, if applicable; and

(B) common area usage such as installed landscape irrigation systems, pools and laundry rooms, if any, as follows:

(i) if all common areas are separately metered or submetered, deduct the actual common area usage;

(ii) if common areas that are served through the master meter that provides water to the dwelling units are not separately metered or submetered and there is an installed landscape irrigation system, deduct at least 25% of the retail public utility's master meter bill;

(iii) if all water used for an installed landscape irrigation system is metered or submetered and there are other common areas such as pools or laundry rooms that are not metered or submetered, deduct at least 5% of the retail public utility's master meter bill; or

(iv) if common areas that are served through the master meter that provides water to the dwelling units are not separately metered or submetered and there is no installed landscape irrigation system, deduct at least 5% of the retail public utility's master meter bill.

(2) To calculate a tenant's bill:

(A) for an apartment house, the owner shall multiply the amount established in paragraph (1) of this subsection by:

(i) the number of occupants in the tenant's dwelling unit divided by the total number of occupants in all dwelling units at the beginning of the month for which bills are being rendered; or

(ii) the number of occupants in the tenant's dwelling unit using a ratio occupancy formula divided by the total number of occupants in all dwelling units at the beginning of the retail public utility's billing period using the same ratio occupancy formula to determine the total. The ratio occupancy formula will reflect what the owner believes more accurately represents the water use in units that are occupied by multiple tenants. The ratio occupancy formula that is used must assign a fractional portion per tenant of no less than that on the following scale:

(I) dwelling unit with one occupant = 1;

(II) dwelling unit with two occupants = 1.6;

(III) dwelling unit with three occupants = 2.2; or

(IV) dwelling unit with more than three occupants = 2.2 + 0.4 per each additional occupant over three; or

(iii) the average number of occupants per bedroom, which shall be determined by the following occupancy formula. The formula must calculate the average number of occupants in all dwelling units based on the number of bedrooms in the dwelling unit according to the scale below, notwithstanding the actual number of occupants in each of the dwelling unit's bedrooms or all dwelling units:

(I) dwelling unit with an efficiency = 1;

(II) dwelling unit with one bedroom = 1.6;

(III) dwelling unit with two bedrooms = 2.8;

(IV) dwelling unit with three bedrooms = 4 + 1.2 for each additional bedroom; or

(iv) a factor using a combination of square footage and occupancy in which no more than 50% is based on square footage. The square footage portion must be based on the total square footage living area of the dwelling unit as a percentage of the total square footage living area of all dwelling units of the apartment house; or

(v) the individually submetered hot or cold water usage of the tenant's dwelling unit divided by all submetered hot or cold water usage in all dwelling units;

(B) a condominium manager shall multiply the amount established in paragraph (1) of this subsection by any of the factors under subparagraph (A) of this paragraph or may follow the methods outlined in the\ condominium contract;

(C) for a manufactured home rental community, the owner shall multiply the amount established in paragraph (1) of this subsection by:

(i) any of the factors developed under subparagraph (A) of this paragraph; or

(ii) the area of the individual rental space divided by the total area of all rental spaces; and

(D) for a multiple use facility, the owner shall multiply the amount established in paragraph (1) of this subsection by:

(i) any of the factors developed under subparagraph (A) of this paragraph; or

(ii) the square footage of the rental space divided by the total square footage of all rental spaces.

(3) If a tenant moves in or out during a billing period, the owner may calculate a bill for the tenant. If the tenant moves in during a billing period, the owner shall prorate the bill by calculating a bill as if the tenant were there for the whole month and then charging the tenant for only the number of days the tenant lived in the unit divided by the number of days in the month multiplied by the calculated bill. If a tenant moves out during a billing period before the owner receives the bill for that period from the retail public utility, the owner may calculate a final bill. owner may calculate the tenant's bill by calculating the tenant's average bill for the last three months and multiplying that average bill by the number of days the tenant was in the unit divided by the number of days in that month.

(f) Conversion to approved allocation method. An owner using an allocation formula other than those approved in subsection (e) of this section shall immediately provide notice as required under §24.123(c) of this title (relating to Rental Agreement) and either:

(1) adopt one of the methods in subsection (e) of this section; or

(2) install submeters and begin billing on a submetered basis; or

(3) discontinue billing for utility services.

## §24.125. Billing.

(a) Monthly billing of total charges. The owner shall bill the tenant each month for the total charges calculated under §24.124 of this title (relating to Charges and Calculations). If it is permitted in the rental agreement, an occupant or occupants who are not residing in their rental unit for a period longer than 30 days may be excluded from the occupancy calculation and from paying a water and sewer bill for that period.

(b) Rendering bill.

(1) Allocated bills shall be rendered as promptly as possible after the owner receives the retail public utility bill.

(2) Submeter bills shall be rendered as promptly as possible after the owner

the rental agreement if the owner is billing using the retail public utility's rate.

(c) Submeter reading schedule. Submeters or point-of-use submeters shall be read within three days of the scheduled reading date of the retail public utility's master meter or according to the schedule in the rental agreement if the owner is billing using the retail public utility's rate.

(d) Billing period.

(1) Allocated bills shall be rendered for the same billing period as that of the retail public utility, generally monthly, unless service is provided for less than that period.

(2) Submeter bills shall be rendered for the same billing period as that of the retail public utility, generally monthly, unless service is provided for less than that period. If the owner uses the retail public utility's actual rate, the billing period may be an alternate billing period specified in the rental agreement.

(e) Multi-item bill. If issued on a multi-item bill, charges for submetered or allocated utility service must be separate and distinct from any other charges on the bill.

(f) Information on bill. The bill must clearly state that the utility service is submetered or allocated, as applicable, and must include all of the following:

(1) total amount due for submetered or allocated water;

(2) total amount due for submetered or allocated wastewater;

(3) total amount due for dwelling unit base charge(s) or customer service charge(s) or both, if applicable;

(4) total amount due for water or wastewater usage, if applicable;

(5) the name of the retail public utility and a statement that the bill is not from the retail public utility;

(6) name and address of the tenant to whom the bill is applicable;

(7) name of the firm rendering the bill and the name or title, address, and telephone number of the firm or person to be contacted in case of a billing dispute; and

(8) name, address, and telephone number of the party to whom payment is to be made.

(g) Information on submetered service. In addition to the information required in subsection (f) of this section, a bill for submetered service must include all of the following:

(1) the total number of gallons, liters, or cubic feet submetered or measured by point-of-use submeters;

(2) the cost per gallon, liter, or cubic foot for each service provided; and

(3) total amount due for a service charge charged by an owner of a manufactured home rental community, if applicable.

(h) Due date. The due date on the bill may not be less than 16 days after it is mailed or hand delivered to the tenant, unless the due date falls on a federal holiday or weekend, in which case the following work day will be the due date. The owner shall record the date the bill is mailed or hand delivered. A payment is delinquent if not received by the due date.

(i) Estimated bill. An estimated bill may be rendered if a master meter, submeter, or point-of-use submeter has been tampered with, cannot be read, or is out of order; and in such case, the bill must be distinctly marked as an estimate and the subsequent bill must reflect an adjustment for actual charges.

(j) Payment by tenant. Unless utility bills are paid to a third-party billing company on behalf of the owner, or unless clearly designated by the tenant, payment must be applied first to rent and then to utilities.

(k) Overbilling and underbilling. If a bill is issued and subsequently found to be in error, the owner shall calculate a billing adjustment. If the tenant is due a refund, an adjustment must be calculated for all of that tenant's bills that included overcharges. If the overbilling or underbilling affects all tenants, an adjustment must be calculated for all of the tenants' bills. If the tenant was undercharged, and the cause was not due to submeter or point-of-use submeter error, the owner may calculate an adjustment for bills issued in the previous six months. If the total undercharge is $25 or more, the owner shall offer the tenant a deferred payment plan option, for the same length of time as that of the underbilling. Adjustments for usage by a previous tenant may not be back billed to a current tenant.

(l) Disputed bills. In the event of a dispute between a tenant and an owner regarding any bill, the owner shall investigate the matter and report the results of the investigation to the tenant in writing. The investigation and report must be completed within 30 days from the date the tenant gives written notification of the dispute to the owner.

(m) Late fee. A one-time penalty not to exceed 5% may be applied to delinquent accounts. If such a penalty is applied, the bill must indicate the amount due if the late penalty is imposed.

## §24.127. Submeters or Point-of-Use Submeters and Plumbing Fixtures.

(a) Submeters or point-of-use submeters

(1) Same type submeters or point-of-use submeters required. All submeters or point-of-use submeters throughout a property must use the same unit of measurement, such as gallon, liter, or cubic foot.

(2) Installation by owner. The owner shall be responsible for providing, installing, and maintaining all submeters or point-of-use submeters necessary for the measurement of water to tenants and to common areas, if applicable.

(3) Submeter or point-of-use submeter tests prior to installation. No submeter or point-of-use submeter may be placed in service unless its accuracy has been established. If any submeter or point-of-use submeter is removed from service, it must be properly tested and calibrated before being placed in service again.

(4) Accuracy requirements for submeters and point-of-use submeters. Submeters must be calibrated as close as possible to the condition of zero error and within the accuracy standards established by the American Water Works Association (AWWA) for water meters. Point-of-use submeters must be calibrated as closely as possible to the condition of zero error and within the accuracy standards established by the AmericanSociety of Mechanical Engineers (ASME) for point- of-use and branch- water submetering systems.

(5) Location of submeters and point-of-use submeters. Submeters and point-of-use submeters must be installed in accordance with applicable plumbing codes and AWWA standards for water meters or ASME standards for point-of-use submeters, and must be readily accessible to the tenant and to the owner for testing and inspection where such activities will cause minimum interference and inconvenience to the tenant.

(6) Submeter and point-of-use submeter records. The owner shall maintain a record on each submeter or point-of-use submeter which includes:

(A) an identifying number;

(B) the installation date (and removal date, if applicable);

(C) date(s) the submeter or point-of-use submeter was calibrated or tested;

(D) copies of all tests; and

(E) the current location of the submeter or point-of-use submeter.

(7) Submeter or point-of-use submeter test on request of tenant. Upon receiving a written request from the tenant, the owner shall either:

(A) provide evidence, at no charge to the tenant, that the submeter or point-of- use submeter was calibrated or tested within the preceding 24 months and determined to be within the accuracy standards established by the AWWA for water meters or ASME standards for point-of-use submeters; or

(B) have the submeter or point-of-use submeter removed and tested and promptly advise the tenant of the test results.

(8) Billing for submeter or point-of-use submeter test.

(A) The owner may not bill the tenant for testing costs if the submeter fails to meet AWWA accuracy standards for water meters or ASME standards for point-of-use submeters.PROJECT NO. 42190 PROPOSAL FOR ADOPTION PAGE 345 OF 379.

(B) The owner may not bill the tenant for testing costs if there is no evidence that the submeter or point-of-use submeter was calibrated or tested within the preceding 24 months.

(C) The owner may bill the tenant for actual testing costs (not to exceed $25) if the submeter meets AWWA accuracy standards or the point-of-use submeter meets ASME accuracy standards and evidence as described in paragraph (7)(A) of this subsection was provided to the tenant.

(9) Bill adjustment due to submeter or point-of-use submeter error. If a submeter does not meet AWWA accuracy standards or a point-of-use submeter does not meet ASME accuracy standards and the tenant was overbilled, an adjusted bill must be rendered in accordance with §24.125(k) of this title (relating to Billing). The owner may not charge the tenant for any underbilling that occurred because the submeter or point-of-use submeter was in error.

(10) Submeter or point-of-use submeter testing facilities and equipment. For submeters, an owner shall comply with the AWWA's meter testing requirements. For point-of-use meters, an owner shall comply with ASME's meter testing requirements.

(b) Plumbing fixtures. After January 1, 2003, before an owner of an apartment house, manufactured home rental community, or multiple use facility or a manager of a condominium may implement a program to bill tenants for submetered or allocated water service, the owner or manager shall adhere to the following standards:

(1) Texas Health and Safety Code, §372.002, for sink or lavatory faucets, faucet aerators, and showerheads;

(2) perform a water leak audit of each dwelling unit or rental unit and each common area and repair any leaks found; and

(3) not later than the first anniversary of the date an owner of an apartment house, manufactured home rental community, or manager of a condominium begins to bill for submetered or allocated water service, the owner or manager shall:

(A) remove any toilets that exceed a maximum flow of 3.5 gallons per flush; and

(B) install toilets that meet the standards prescribed by Texas Health and Safety Code, §372.002.

(c) Plumbing fixture not applicable. Subsection (b) of this section does not apply to a manufactured home rental community owner who does not own the manufactured homes located on the property of the manufactured home rental community.

# LEASE ADDENDUM FOR SATELLITE DISH OR ANTENNA

Under a Federal Communications Commission (FCC) order, you as our resident have a right to install a transmitting or receiving satellite dish or antenna on the leased premises, subject to FCC limitations. We as a rental housing owner are allowed to impose reasonable restrictions relating to such installation. You are required to comply with these restrictions as a condition of installing such equipment. This addendum contains the restrictions that you and we agree to follow.

1. **Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. __1027__ in the __ComCapp Timberstone LLC__

Apartments in _____ __Houston__ _____, Texas OR the house, duplex, etc. located at (street address) in _____, Texas.

2. **Number and size.** You may install __1__ satellite dish(es) or antenna(s) on the leased premises. A satellite dish may not exceed one meter (3.3 feet) in diameter. Antennas that only transmit signals or that are not covered by 47 CFR § 1.4000 are prohibited.

3. **Location.** Your satellite dish or antenna must be located: (1) inside your dwelling; or (2) in an area outside your dwelling such as a balcony, patio, yard, etc. of which you have exclusive use under your lease. Installation is not permitted on any parking area, roof, exterior wall, window, window sill, fence or common area, or in an area that other residents are allowed to use. A satellite dish or antenna may not protrude beyond the vertical and horizontal space that is leased to you for your exclusive use.

4. **Safety and non-interference.** Your installation: (1) must comply with all applicable ordinances and laws and all reasonable safety standards; (2) may not interfere with our cable, telephone or electrical systems or those of neighboring properties; (3) may not be connected to our telecommunication systems; and (4) may not be connected to our electrical system except by plugging into a 110-volt duplex receptacle. If the satellite dish or antenna is placed in a permitted outside area, it must be safely secured by one of three methods: (1) securely attaching it to a portable, heavy object such as a small slab of concrete; (2) clamping it to a part of the building's exterior that lies within your leased premises (such as a balcony or patio railing); or (3) any other method approved by us in writing. No other methods are allowed. We may require reasonable screening of the satellite dish or antenna by plants, etc., so long as it does not impair reception.

5. **Signal transmission from exterior dish or antenna to interior of dwelling.** Under the FCC order, you may not damage or alter the leased premises and may not drill holes through outside walls, door jams, window sills, etc. If your satellite dish or antenna is installed outside your dwelling (on a balcony, patio, etc.), the signals received by it may be transmitted to the interior of your dwelling only by the following methods: (1) running a "flat" cable under a door jam or window sill in a manner that does not physically alter the premises and does not interfere with proper operation of the door or window; (2) running a traditional or flat cable through a pre-existing hole in the wall (that will not need to be enlarged to accommodate the cable); (3) connecting cables "through a window pane," similar to how an external car antenna for a cellular phone can be connected to inside wiring by a device glued to either side of the window--without drilling a hole through the window; (4) wireless transmission of the signal from the satellite dish or antenna to a device inside the dwelling; or (5) any other method approved by us in writing.

6. **Safety in installation.** In order to assure safety, the strength and type of materials used for installation must be approved by us. Installation must be done by a qualified person or company approved by us. Our approval will not be unreasonably withheld. An installer provided by the seller of the satellite dish or antenna is presumed to be qualified.

7. **Maintenance.** You will have the sole responsibility for maintaining your satellite dish, antenna and all related equipment.

8. **Removal and damages.** You must remove the satellite dish or antenna and all related equipment when you move out of the dwelling. In accordance with TAA Lease Contract paragraph 40, you must pay for any damages and for the cost of repairs or repainting caused by negligence, carelessness, accident or abuse which may be reasonably necessary to restore the leased premises to its condition prior to the installation of your satellite dish, antenna or related equipment. You will not be responsible for normal wear.

9. **Liability insurance and indemnity.** You must take full responsibility for the satellite dish, antenna and related equipment. If the dish or antenna is installed at a height or in some other way that could result in injury to others if it becomes unattached and falls, you must provide us with evidence of liability insurance to protect us against claims of personal injury and property damage to others, related to your satellite dish, antenna and related equipment. The insurance coverage must be __100000.00__, which is an amount reasonably determined by us to accomplish that purpose. Factors affecting the amount of insurance include height of installation above ground level, potential wind velocities, risk of the dish/antenna becoming unattached and falling on someone, etc. You agree to hold us harmless and indemnify us against any of the above claims by others.

10. **Security deposit.** Your security deposit (in paragraph 4 of your Lease Contract) is increased by an additional reasonable sum of $ __100.00__ ☒ effective at time of installation or ☐ effective within _____ days of installation to help protect us against possible repair costs, damages, or failure to remove the satellite dish, antenna and related equipment at time of move-out. Factors affecting any security deposit may vary, depending on: (1) how the dish or antenna is attached (nails, screws, lag bolts drilled into walls); (2) whether holes were permitted to be drilled through walls for the cable between the satellite dish and the TV; and (3) the difficulty and cost of repair or restoration after removal, etc.

11. **When you may begin installation.** You may start installation of your satellite dish, antenna or related equipment only after you have: (1) signed this addendum; (2) provided us with written evidence of the liability insurance referred to in paragraph 9 of this addendum; (3) paid us the additional security deposit, if applicable, in paragraph 10; and (4) received our written approval, which may not be unreasonably withheld, of the installation materials and the person or company that will do the installation.

12. **Miscellaneous.** If additional satellite dishes or antennas are desired, an additional lease addendum must be executed.

**Resident or Residents**
*[All residents must sign here]*

Regina Sophus

**Owner or Owner's Representative**
*[signs here]*

**Date of Lease Contract**

__January 9, 2015__

# LEASE ADDENDUM FOR
## ENCLOSED GARAGE, CARPORT, OR STORAGE UNIT

1. **Addendum.** This is an addendum to the lease between you and us for Apt. No. ___1027___ in the ___ComCapp___ **Timberstone LLC** _____

_____

Apartments in _____Houston_____, Texas
OR
the house, duplex, etc. located at (street address)

_____, Texas.

2. **Garage, carport, or storage unit.** You are entitled to exclusive possession of: *(check as applicable)*
   - ❑ garage or carport attached to the dwelling;
   - ❑ garage space number(s)_____ ;
   - ❑ carport space number(s) _____ ; and/or
   - ❑ storage unit number(s) _____ .

   The monthly rent in paragraph 6 of the Lease Contract covers both the dwelling and the checked area(s) above. All terms and conditions of the lease apply to the above areas unless modified by this addendum.

3. **Use restrictions.** Garage or carport may be used only for storage of operable motor vehicles unless otherwise stated in our rules or community policies. Storage units may be used only for storage of personal property. No one may sleep, cook, barbeque, or live in a garage, carport, or storage unit. Persons not listed as a resident or occupant in the lease may not use the areas covered by this addendum. No plants may be grown in such areas.

4. **No dangerous items.** In our sole judgment, items that pose an environmental hazard or a risk to the safety or health of other residents, occupants, or neighbors, or that violate any government regulation, may not be stored. Prohibited items include fuel (other than in a properly capped fuel tank of a vehicle or a closed briquette lighter fluid container), fireworks, rags, piles of paper, or other material that may create a fire or environmental hazard. We may remove from such areas, without prior notice, items that we believe might constitute a fire or environmental hazard. Because of carbon monoxide risks, you may not run the motor of a vehicle inside a garage unless the garage door is open to allow fumes to escape.

5. **No smoke, fire, or carbon monoxide detectors.** No smoke, fire, or carbon monoxide detectors will be furnished by us unless required by law. We may choose to provide a detection device not required by law by separate addendum.

6. **Garage door opener.** If an enclosed garage is furnished, you ☒ will ❑ will not be provided with a ☒ garage door opener and/or ❑ garage key. You will be responsible for maintenance of

any garage door opener, including battery replacement. Transmitter frequency settings may not be changed on the garage door or opener without our prior written consent. At the time of termination of the lease, the total number of garage door opener(s) and/or garage key(s) that you were assigned must be returned to us. Failure to return such opener and/or key will result in a fine of $ ___50.00___ , which will be deducted from your security deposit.

7. **Security.** We will not have any security responsibilities for areas covered by this addendum. Always remember to lock any door of a garage or storage unit and any door between a garage and the dwelling. When leaving, be sure to lock all keyed deadbolt locks.

8. **Insurance and loss/damage to your property.** Any area covered by this addendum is accepted by you "as is." You will maintain liability and comprehensive insurance coverage for any vehicle parked or stored. **We will have no responsibility for loss or damage to vehicles or other property parked or stored in a garage, carport, or storage unit, whether caused by accident, fire, theft, water, vandalism, pests, mysterious disappearance, or otherwise.** We are not responsible for pest control in such areas.

9. **Compliance.** We may periodically open and enter garages and storerooms to ensure compliance with this addendum. In that event, written notice of such opening and entry will be left inside the main entry door of your dwelling or inside the door between the garage and your dwelling.

10. **No lock changes, alterations, or improvements.** Without our prior written consent, locks on doors of garages and storage units may not be rekeyed, added, or changed, and improvements, alterations, or electrical extensions or changes to the interior or exterior of such areas are not allowed. You may not place nails, screws, bolts, or hooks into walls, ceilings, floors, or doors. Any damage not caused by us or our representatives to areas covered by this addendum will be paid for by you.

11. **Move-out and remedies.** Any items remaining after you have vacated the dwelling will be removed, sold, or otherwise disposed of according to paragraph 14 of the Lease Contract, which addresses disposition or sale of property left in an abandoned or surrendered dwelling. All remedies in the lease apply to areas covered by this addendum. Upon termination of the lease, your failure to return any garage door opener or other remote control device will result in a charge against you.

Resident or Residents
*(All residents must sign)*

Owner or Owner's Representative
*(Signs below)*

Regina Sophus

Date of Lease Contract
**January 9, 2015**

# LEASE ADDENDUM FOR
# PATIO OR YARD MAINTENANCE

1. **Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. ___1027___ in the **ComCapp Timberstone LLC** _____

   _____ Apartments
   in _____ Houston _____ , Texas
   OR
   the condominium/townhome located at (street address) _____ in _____ , Texas.

2. **Responsibility for area.** The apartment or condominium/townhome unit has a fenced or enclosed patio, yard or atrium. Unless we, as owner, expressly assume responsibilty below, you, as resident, will perform or pay for yard maintenance of such fenced or enclosed area, as follows:

   ☒ You or ☐ we will keep the lawn mowed and edged and maintain all plants, trees, shrubs, etc.

   ☒ You or ☐ we will water the lawn and other vegetation.

   ☒ You or ☐ we will keep the lawn, flowerbeds, sidewalks, porches and driveways free of trash and debris.

   ☒ You are, ☐ we are, or ☐ no one is obligated to fertilize lawn and plants.

3. **Report problems.** You must promptly report infestations or dying vegetation to us. You may not modify existing landscape, change any plants or plant a garden without our prior written approval.

### Resident or Residents
*[All residents must sign here]*

Regina Sophus

### Owner or Owner's Representative
*[signs here]*

Date of Lease Contract

**January 9, 2015**

# LEASE ADDENDUM
## FOR REMOTE CONTROL, CARD, OR CODE ACCESS GATE

1. **Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. ___**1027**___ in the **ComCapp Timberstone LLC** _____

   _____ Apartments
   in _____**Houston**_____, Texas.

2. **Remote control/cards/code for gate access.**

   ❑ **Remote control for gate access.** Each person who is 18 years of age or older and listed as a resident on the lease will be given a remote control at no cost to use during his or her residency. Each additional remote control for you or your children or other occupants will require a $___**35.00**___ non-refundable fee.

   ❑ **Cards for gate access.** Each person who is 18 years of age or older and listed as a resident on the lease will be given a card at no cost to use during his or her residency. Each additional card for you or your children or other occupants will require a $_____ non-refundable fee.

   ☒ **Code for gate access.** Each resident will be given, at no cost, an access code (keypad number) for the pedestrian or vehicular access gates. It is to be used only during your residency.

3. **Damaged, lost or unreturned remote controls, cards or code changes.**

   ☒ If a remote control is lost, stolen or damaged, a $___**35.00**___ fee will be charged for a replacement. If a remote control is not returned or is returned damaged when you move out, there will be a $___**50.00**___ deduction from the security deposit.

   ❑ If a card is lost, stolen or damaged, a $_____ fee will be charged for a replacement card. If a card is not returned or is returned damaged when you move out, there will be a $_____ deduction from the security deposit.

   ☒ We may change the code(s) at any time and notify you accordingly.

4. **Report damage or malfunctions.** Please immediately report to the office any malfunction or damage to gates, fencing, locks or related equipment.

5. **Follow written instructions.** We ask that you and all other occupants read the written instructions that have been furnished to you regarding the access gates. This is important because if the gates are damaged by you or your family, guest or invitee through negligence or misuse, you are liable for the damages under your lease, and collection of damage amounts will be pursued.

6. **Personal injury and/or personal property damage.** Anything mechanical or electronic is subject to malfunction. Fencing, gates or other devices will not prevent all crime. No security system or device is foolproof or 100 percent successful in deterring crime. Crime can still occur. Protecting residents, their families, occupants, guests and invitees from crime is the sole responsibility of residents, occupants and law enforcement agencies. You should first call 911 or other appropriate emergency police numbers if a crime occurs or is suspected. We are not liable to any resident, family member, guest, occupant or invitee for personal injury, death or damage/loss of personal property from incidents related to perimeter fencing, automobile access gates and/or pedestrian access gates. We reserve the right to modify or eliminate security systems other than those statutorily required.

7. **Rules in using vehicle gates.**

   * Always approach entry and exit gates with caution and at a very slow rate of speed.

   * Never stop your car where the gate can hit your vehicle as the gate opens or closes.

   * Never follow another vehicle into an open gate. Always use your card to gain entry.

   * Report to management the vehicle license plate number of any vehicle that piggybacks through the gate.

   * Never force the gate open with your car.

   * Never get out of your vehicle while the gates are opening or closing.

   * If you are using the gates with a boat or trailer, please contact management for assistance. The length and width of the trailer may cause recognition problems with the safety loop detector and could cause damage.

   * Do not operate the gate if there are small children nearby who might get caught in it as it opens or closes.

   * If you lose your card, please contact the management office immediately.

   * Do not give your card or code to anyone else.

   * Do not tamper with gate or allow your occupants to tamper or play with gates.

<table>
<tr><td>**Resident or Residents**<br>*[All residents must sign here]*</td><td>**Owner or Owner's Representative**<br>*[signs here]*</td></tr>
</table>

**Regina Sophus**

_____

_____

_____

_____

**Owner or Owner's Representative**
*[signs here]*

_____

**Date of Lease Contract**

**January 9, 2015**
_____

# LEASE ADDENDUM FOR
# WASHING MACHINE

1. **Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. _____1027_____ in the **ComCapp Timberstone LLC** _____

_____

_____ Apartments
in _____**Houston**_____ , Texas
OR
the house, duplex, etc. located at (street address)_____

_____ in
_____ , Texas.

2. **Permission.** You (as residents) have permission from us (as owner) to install and use a washing machine in the dwelling unit described above, subject to the conditions in this addendum.

Please remember that we do not select your washing machine, install it, maintain it, or use it. You are in the best position to prevent water or other damage caused by: (1) a defective washing machine; (2) a washing machine accident; or (3) improper installation, maintenance or use of a washing machine.

3. **Conditions.** If your washing machine leaks, floods, or otherwise malfunctions or is misued, it can cause a lot of problems and a lot of damage to your unit and other units, as well as damage to your personal property and personal property of residents in other units. For these reasons, your right to install and use a washing machine in your unit is subject to the following conditions. You automatically agree to those conditions when connecting or using a washing machine in your unit.

4. **Installation.** You should be especially careful in your choice of a washing machine and in its installation, maintenance and use—just as if it were in your own home. You and all other residents, occupants and guests in your unit must follow manufacturer's instructions for the washing machine's installation, maintenance and use. We recommend that you have it professionally installed.

5. **Responsibility for damage.** You agree to assume strict liability for all damage to your unit and to other units and to personal property in your unit and other units if the washing machine leaks, floods, malfunctions or is misused, or in any other way causes damage—unless it is caused by us or our management company. That means you will be responsible for costs of removing water from carpets, replacing permanently damaged carpets, repainting, and any other repairs or unit damage, as well as damage to personal property in your unit and other units if, among other things:

- the water hoses break or leak; or
- the water hoses were incorrectly connected or did not have protective washers in the connections; or
- the washing machine was overloaded, causing it to malfunction; or
- the washing machine leaks or malfunctions for any other reason.

The owner's insurance will not cover such damages.

6. **New hoses.** When installing the washing machine, you must use new hoses since bursting or leaking hoses are the most common cause of water damage. Stainless braided water hoses are recommended.

7. **Inspection.** You must not use the washing machine until management has inspected its installation. Such inspection does not relieve you of liability in the event of water or other damage from your washing machine.

8. **Insurance.** At all times you must carry renter's insurance that provides insurance coverage for damage to your personal belongings from accidental water discharge from your washing machine. It must also provide coverage for any potential liability, due to your fault, for water or other damage to other units and to personal property of others. You must verify with your agent that such coverages are included in your policy and must furnish us a copy of the policy upon our request.

**Resident or Residents**
*(All residents must sign)*

_____
Regina Sophus

_____

_____

_____

_____

**Owner or Owner's Representative**
*(Signs below)*

_____

**Date of Lease Contract**
_____**January 9, 2015**_____

# LEASE ADDENDUM FOR
## ALLOCATING SERVICES AND GOVERNMENT FEES

1. **Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. ___1027___ in the **ComCapp Timberstone LLC**.

_____

in _____**Houston**_____ , Texas.
OR
the house, duplex, etc. located at (street address)

in _____ , Texas.

2. **Reason for allocation.** Apartment owners receive bills for services provided to residents and charges for various governmental fees. These are direct costs that the apartment community incurs. In order to help control the cost of rent, we have chosen to allocate the services and governmental fees indicated below through an allocated bill using a standardized formula to distribute these costs fairly. While we may impose a nominal fee to help recover our costs in administering these bills, we do not add any other costs to these bills and make no profit off of them.

3. **Services and governmental fees allocated.** We will allocate the following services and governmental fees:

   - ❏ Cable/satellite television
   - ❏ Stormwater/drainage
   - ❏ Trash removal/recycling
   - ❏ Street repair/maintenance fee
   - ❏ Emergency services fee
   - ❏ Conservation district fee
   - ❏ Inspection fee
   - ❏ Registration/license fee
   - ❏ Other_____
   - ❏ Other_____
   - ❏ Other_____
   - ❏ Other_____
   - ❏ Other_____
   - ❏ Other_____

4. **Your payment due date.** Payment of your allocated services and governmental fee bill is due 16 days after the date it is postmarked or hand delivered to your apartment. You agree to mail or deliver payment to the place indicated on your bill so that payment is received no later than the due date. You will pay a late charge of 5 percent of your services and governmental fee bill if we do not receive timely payment. If you are late in paying the services and governmental fee bill, we may cut-off services, as allowed by law and we may immediately exercise all other lawful remedies, including eviction--just like late payment of rent.

5. **Allocation procedures.** Your monthly rent under the TAA Lease Contract does *not* include a charge for the services and governmental fees indicated above. Instead, you will be receiving a separate bill from us each month for these services and governmental fees. We may include these items as separate and distinct charges as part of a mutli-item bill.

   You agree to and we will allocate the indicated services and governmental fees for the apartment community based on the allocation method checked below: *(check only one)*

   - ❏ A percentage reflecting your apartment unit's share of the total square footage in the apartment community, i.e., your unit's square footage divided by the total square footage in all apartment units.

   - ❏ A percentage reflecting your apartment unit's share of the total number of people living in the apartment community, i.e., the number of people living in your apartment divided by the total number of people living in the entire apartment community for the month. ("People" for this purpose are all residents and occupants listed in leases at the apartment community as having a right to occupy the respective units).

   - ❏ Half of your allocation will be based on your apartment unit's share of total square footage and half will be based on your share of total people living in the apartment community, as described above.

   - ❏ Per dwelling unit

   - ❏ Other formula *(see attached page)*

6. **Penalties and fees.** Only the total of the services and governmental fee bills will be allocated. Penalties or interest for any late payment of these bills by us will be paid for by us and will not be allocated. A nominal administrative fee of $ _____ per month (not to exceed $3) will be added to your bill for processing, billing and/or collecting.

7. **Change of allocation formula.** The above allocation formula for determining your share of the services and governmental fee bills cannot be changed except as follows: (1) you receive notice of the new formula at least 35 days before it takes effect; and (2) you agree to the change in a signed lease renewal or signed mutual agreement.

8. **Right to examine records.** You may examine our service and governmental fee bills from the companies and governmental entities and our calculations relating to the monthly allocation of these bills during regular weekday office hours. Please give us reasonable advance notice to gather the data.

**Resident or Residents**
*[All residents must sign here]*

Regina Sophus
_____

_____

_____

_____

_____

**Owner or Owner's Representative**
*[signs here]*

_____

**Date of Lease Contract**

_____**January 9, 2015**_____

# COMCAPP
## LEASE ADDENDUM FOR
## SMOKING IN APARTMENT

1. **Addendum.** This is an addendum to the Lease Contract for Apt. No. _1081_ In the Legacy @ Champion Forest Apartments in Houston,Texas.

2. A charge of $200 will be charged at time of Move-Out for any apartment that has smoke residue or smell.

3. Additional charges will be assessed for damages.

# SMOKE DAMAGE IS NOT NORMAL WEAR AND TEAR.

**Your responsibility for damages and cleaning.** You are responsible for payment of all costs and damages to your apartment for repair, replacement, or cleaning due to smoking or smoke-related damage caused by you or your occupants, family, guests or invitees. Smoke-related damage, including but not limited to smoke odor that permeates sheetrock, carpeting, wood, insulation or other components of the dwelling, is in excess of normal wear and tear. These charges are **IN ADDITION TO THE $200** charge described above.

**Definition of smoking.** "Smoking" refers to any use or possession of a cigar, cigarette or pipe containing tobacco or other non-tobacco product while it is burning, lighted or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. "Smoking" also refers to use or possession of burning, lighted or ignited non-tobacco products if they are noxious, offensive, unsafe, illegal, unhealthy or irritating to other persons.

Resident or Residents
(All residents must sign)

Owner or Owner's Representative

_____

_____

_____

Date_____



TEXAS APARTMENT ASSOCIATION
M · E · M · B · E · R

# Bed Bug Addendum

Date of Lease: __January 9, 2015__
(when the Lease is filled out)

*Please note: We want to maintain a high-quality living environment for you. It's important to work together to minimize the potential for bed bugs in your dwelling and others. This addendum outlines your responsibility and potential liability when it comes to bed bugs. It also gives you some important information about them.*

1. **Addendum.** This is an addendum to the Lease Contract that you, the resident or residents, signed on the dwelling you have agreed to rent. That dwelling is:

   Apt. # ___1027___ at __ComCapp Timberstone LLC__

   _____ (name of apartments)
   or other dwelling located at _____

   _____ (street address of house, duplex, etc.)
   _____ (city)
   _____ (state) _____ (zip).

2. **Purpose.** This addendum modifies the Lease Contract to address any infestation of bed bugs (Cimex lectularius) that might be found in the dwelling or on your personal property. We will rely on representations that you make to us in this addendum.

3. **Inspection.** (*Check one*)

   ☒ You have inspected the dwelling before moving in or signing this addendum, and you did not find any evidence of bed bugs or bed-bug infestation.

   · **OR**

   ☐ You will inspect the dwelling within 48 hours after moving in or signing this addendum and will notify us of any bed bugs or bed-bug infestation.

4. **Infestations.** We are not aware of any current evidence of bed bugs or bed-bug infestation in the dwelling. You must read the information on the back of this addendum and then certify one of the following statements: (*check one*)

   ☒ You are not aware of any infestation or presence of bed bugs in your current or previous apartment, home, or dwelling or in any of your furniture, clothing, personal property, or possessions, nor have you been exposed to any bed-bug infestation or presence.

   **OR**

   ☐ If you previously lived anywhere that had a bed-bug infestation, all your personal property (including furniture, clothing, and other belongings) has been treated by a licensed pest-control professional and is now free of further infestation.

   If you disclose a previous experience of bed-bug infestation, we can review documentation of the treatment and inspect your personal property and possessions to confirm the absence of bed bugs. Describe here any previous bed-bug infestation that you may have experienced: _____

   _____
   _____
   _____

5. **Access for Inspection and Pest Treatment.** You must allow us and our pest-control agents access to the dwelling at reasonable times to inspect for or treat bed bugs. You and your family members, occupants, guests, and invitees must cooperate and not interfere with inspections or treatments. We have the right to select any licensed pest-control professional to treat the dwelling and building. We can select the method of treating the dwelling, building, and common areas for bed bugs. We can also inspect and treat adjacent or neighboring dwellings to the infestation, even if those dwellings are not the source or cause of the known infestation. Si-

multaneously as we treat the dwelling, you must, at your expense, have your personal property, furniture, clothing, and possessions treated according to accepted treatment methods by a licensed pest-control firm that we approve. If you fail to do so, you will be in default and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for a bed-bug infestation on your own.

6. **Notification.** You must promptly notify us:

   · of any known or suspected bed-bug infestation or presence in the dwelling, or in any of your clothing, furniture, or personal property;

   · of any recurring or unexplained bites, stings, irritations, or sores on the skin or body that you believe are caused by bed bugs, or by any condition or pest you believe is in the dwelling; **AND**

   · if you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or if you receive any confirmation of bed-bug presence by a licensed pest-control professional or other authoritative source.

7. **Cooperation.** If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest-control agents to treat and eliminate them. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleaned before we treat the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed bugs in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing, and personal belongings so we can perform pest-control services. If you don't cooperate with us, you will be in default and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract.

8. **Responsibilities.** You may be required to pay all reasonable costs of cleaning and pest-control treatments incurred by us to treat your dwelling unit for bed bugs. If we confirm the presence or infestation of bed bugs after you move out, you may be responsible for the cost of cleaning and pest control. If we have to move other residents in order to treat adjoining or neighboring dwellings to your dwelling unit, you may have to pay any lost rental income and other expenses we incur to relocate the neighboring residents and to clean and perform pest-control treatments to eradicate infestations in other dwellings. If you don't pay us for any costs you are liable for, you will be in default and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract, and we may take immediate possession of the dwelling. If you don't move out after your right of occupancy has been terminated, you will be liable for holdover rent under the Lease Contract.

9. **Transfers.** If we allow you to transfer to another dwelling in the community because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest-control professional. You must provide proof of such cleaning and treatment to our satisfaction.

---

## You are legally bound by this document. Please read it carefully.

**Resident or Residents** (*all sign below*)

_____
(Name of Resident)                          Date signed

_____
(Name of Resident)                          Date signed

_____
(Name of Resident)                          Date signed

**Owner or Owner's Representative** (*sign below*)

_____
                                            Date signed



Houston Apartment Association



EQUAL HOUSING OPPORTUNITY

# SMOKE DETECTOR ADDENDUM

THIS ADDENDUM shall become a part of the Apartment Lease Contract ("Agreement") for Apartment No. _1021_ ("Unit"),
at _Legacy @ Champion Forest_ _____ Apartments, which Agreement is dated
the _16_ day of _January_, 20 _15_, between _ComCapp Timberstone_ as Owner,
and _Regina Sophus_ the resident(s) (You),, whether one or more.

1. **Smoke Detector.** You acknowledge that as of the date of initial occupancy, the Unit is equipped with one or more smoke detectors; that You have inspected the smoke detector(s); and that You find it/them to be in good working order.

2. **Repair.** You agree that it is your duty to regularly test the smoke detector(s). You further agree to notify owner immediately in writing of any problem, defect, malfunction or failure of the smoke detector(s) and to notify owner of the need to install, inspect or repair the smoke detector(s). The Owner will comply with your request for inspection or repair within a reasonable time, considering the availability of material, labor and utilities. Provided, however, you agree that the Owner has no duty to inspect or repair the smoke detector if damage or a malfunction is caused by you, your family, or your guests or invitees during the term of the Agreement or a renewal or extension period, unless you pay in advance the reasonable repair or replacement cost, including labor, materials, taxes and overhead.

3. **Maintenance.** You agree to replace the smoke detector(s) battery, if any, at anytime the existing battery becomes unserviceable. YOU MUST NOT DISCONNECT OR INTENTIONALLY DAMAGE A SMOKE DETECTOR OR REMOVE THE BATTERY OF A SMOKE DETECTOR WITHOUT IMMEDIATELY REPLACING IT WITH A WORKING BATTERY. YOU MAY BE SUBJECT TO DAMAGES, CIVIL PENALTIES AND ATTORNEY'S FEES UNDER SECTION 92.2611 OF THE TEXAS PROPERTY CODE FOR NOT COMPLYING WITH THIS PROVISION.

4. **Replacement.** You agree to reimburse the owner, upon request, for the cost of a new smoke detector and the installation thereof in the event the existing smoke detector(s) becomes damaged by you, or your family, guest or invitees.

5. **Disclaimer. A.** You acknowledge and agree that the owner is not the operator, manufacturer, distributor, retailer or supplier of the smoke detector(s); that you assume full and complete responsibility for all risk and hazards attributable to, connected with or in any way related to the operation, malfunction or failure of the smoke detector(s), regardless of whether such malfunction or failure is attributable to, connected with, or in any way related to the use, operation, manufacture, distribution, repair, servicing or installation of said smoke detector(s). **B.** NO REPRESENTATION, WARRANTIES, UNDERTAKINGS OR PROMISES, WHETHER ORAL OR IMPLIED, OR OTHERWISE, HAVE BEEN MADE BY OWNER, ITS AGENTS OR EMPLOYEES TO YOU REGARDING SAID SMOKE DETECTOR(S), OR THE ALLEGED PERFORMANCE OF THE SAME. OWNER NEITHER MAKES NOR ADOPTS ANY WARRANTY OR ANY NATURE REGARDING SAID SMOKE DETECTOR(S) AND EXPRESSLY DISCLAIMS ALL WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, OR HABITABILITY, OR ANY AND ALL OTHER EXPRESSED OR IMPLIED WARRANTIES, EXCEPT AS EXPRESSLY PROVIDED IN STATUTE, OWNER SHALL NOT BE LIABLE FOR DAMAGES OR LOSSES TO PERSON OR PROPERTY CAUSED BY (1) YOUR FAILURE TO REGULARLY TEST THE SMOKE DETECTOR(S); (2) YOUR FAILURE TO NOTIFY OWNER OF ANY PROBLEM, DEFECT, MALFUNCTION, OR FAILURE OF THE SMOKE DETECTOR(S); (3) THEFT OF THE SMOKE DETECTOR(S) OR ITS SERVICEABLE BATTERY; AND/OR (4) FALSE ALARMS PRODUCED BY THE SMOKE DETECTOR(S). THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF.

6. **Entire Agreement.** The parties acknowledge that this Addendum and the Agreement are the entire agreements of the parties relative to smoke detector(s) in the above referenced unit. Any agreement that in any way varies the terms of this Addendum or the Agreement shall be unenforceable and completely void unless such agreement is in writing and signed by both parties. This Addendum is valid only for members of the HOUSTON APARTMENT ASSOCIATION.

7. **Term.** The Term of this Addendum shall be the same term as Agreement or any renewal or extension of the Agreement.

Executed this _16_ day of _January_ 20 _15_.

RESIDENT(S)
(All residents must sign)

Owner or Owner's Representative

_____          _____

_____          _____

_____          _____

HAA official form, copyright HAA, revised November, 1999.
This form is copyrighted and may not be reproduced
without express permission of HAA.

**Please read this Addendum. It places a duty upon the resident to regularly test the smoke detector(s) and to report all malfunctions of the same to owner in writing.**

# Bed Bugs
## A Guide for Rental-Housing Residents
*(Adapted with permission from the National Apartment Association)*

Bed bugs are wingless, flat, broadly oval-shaped insects, with a typical lifespan of 6 to 12 months. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

## Bed bugs don't discriminate.

Bed bugs' increased presence across the United States in recent decades is due largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental-housing residents, out of shame, to avoid notifying owners of their presence. This only causes the bed bugs to spread.

While bed bugs are more attracted to clutter, they're certainly not discouraged by cleanliness. Bottom line: bed bugs know no social or economic bounds; claims to the contrary are false.

## Bed bugs don't transmit disease.

There exists no scientific evidence that bed bugs carry disease. In fact, federal agencies tasked with addressing pests of public-health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease-carrying pests. Again, claims associating bed bugs with disease are false.

## Learn to identify bed bugs.

Bed bugs can often be found in, around, behind, under, or between:
- Bedding
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams
- Wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Window and door frames
- Ceiling and wall junctions
- Crown moldings
- Wall hangings and loose wallpaper
- Carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors

cause of welts like that often go misdiagnosed. One distinguishing sign is that bed-bug marks often appear in succession on exposed areas of the skin such as the face, neck, and arms. But sometimes a person has no visible reaction at all from direct contact with bed bugs.

While bed bugs typically act at night, they often leave signs of their presence through fecal markings of a red to dark-brown color, visible on or near beds. Blood stains also tend to appear when the bugs have been squashed, usually by an unsuspecting sleeping host. And because they shed, it's not uncommon to find the skin casts they leave behind.

## Prevent bed-bug encounters when traveling.

Because humans serve as bed bugs' main mode of transportation, it's especially important to be mindful of bed bugs when away from home. Experts attribute the spread of bed bugs across all regions of the United States largely to increases in travel and trade, both here and abroad. So travelers are encouraged to take a few minutes on arriving to thoroughly inspect their accommodations before unpacking. Because bed bugs can easily travel from one place to another, it's also a good practice to thoroughly inspect luggage and belongings for bed bugs before heading home.

## Know the bed-bug dos and don'ts.

- Don't bring used furniture from unknown sources into your dwelling. Countless bed-bug infestations have stemmed directly from bringing home second-hand and abandoned furniture. Unless you are absolutely sure that a piece of second-hand furniture is bed-bug-free, you should assume that a seemingly nice looking leather couch, for example, is sitting curbside waiting to be hauled off to the landfill because it's teeming with bed bugs.

- Do inspect rental furniture, including mattresses and couches, for the presence of bed bugs before moving it into your dwelling.

- Do address bed-bug sightings immediately. Rental-housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.

- Don't try to treat bed-bug infestations yourself. Health hazards associated with the misapplication of traditional and nontraditional chemical-based insecticides and pesticides poses too great a risk to you, your family and pets, and your neighbors.

- Do comply with eradication protocol. If the deter-

# LEASE ADDENDUM FOR
## REQUIREMENT OF RENTER'S OR LIABILITY INSURANCE

1. **Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. **1027** in the **ComCapp Timberstone LLC**

   Apartments in **Houston**, Texas
   OR
   the house, duplex, etc. located at (street address)

   in _____, Texas.

2. **Acknowledgment concerning insurance or damage waiver.** You understand that our property or liability insurance may not protect you, your guests or any occupants against loss or damage to personal property or belongings, or cover your liability for loss or damage caused by your actions or those of any occupant of the dwelling or guest. You understand that by not maintaining a renter's or liability insurance policy, you may be liable to us and others for loss or damage caused by your actions or those of any occupant or guest in the dwelling. **You understand that paragraph 8 of the TAA Lease Contract requires you to maintain a renter's or liability insurance policy, which provides limits of liability to third parties in an amount not less than $ _100000.00_ per occurrence.** You agree to maintain, at your own expense, during the Term of the TAA Lease Contract and any subsequent renewal periods, a renter's or liability insurance policy satisfying our requirements. **Liability insurance does not protect you against loss or damage to your personal property or belongings—only a renter's insurance policy does this. It also does not protect you from losses caused by flooding. Flood insurance is different than renter's insurance. For more information regarding renter's or flood insurance, contact the Texas Department of Insurance.**

3. **Election of insurance coverage or damage waiver.** You agree to the following with respect to your renter's or liability insurance **(INITIAL ONE):**

   _____ You agree to purchase renter's or liability insurance through the Program (*complete paragraph 5*);

   **X** You agree to purchase renter's or liability insurance from an insurance company of your choice. If you elect to purchase the required insurance from another company, you will provide us with written proof of

compliance with this addendum on or prior to the lease commencement date, and any time we request it. Your insurance company will be required to provide notice to us within 30 days of any cancellation, non-renewal, or other material change in your insurance policy. Please advise us if you are renting temporarily and have a homeowner's policy or if you have a guarantor on your lease with a current homeowner's policy, which may extend coverage to your rental unit. Please check with the homeowner's insurance provider and submit a certificate of coverage to us if the policy provides the coverage required under the TAA Lease Contract; or

   _____ You agree to pay $ _____ per month to us for liability insurance that we agree meets the requirements of this addendum. You agree to pay us this amount in addition to all other obligations in the TAA Lease Contract. You also agree the cost of this liability insurance will be considered additional rent for purposes of the TAA Lease Contract. You understand that any liability insurance we purchase under this section will not cover you for loss or damage to your personal property--only a renter's insurance policy does this.

4. **Subrogation allowed.** You and we agree that subrogation is allowed by all parties and that this agreement supersedes the language in paragraph 2 of the TAA Lease Contract.

5. **Insurance program.** You understand that we have informed you of any insurance program (the "Program") that we may have made available to you that provides you with an opportunity to purchase renter's insurance and/or liability insurance policies from **www.RentersInsuranceSelect.com 866-654-9900** . Be aware that this insurance company is not owned or operated by us, and we make no guarantees, representations, or promises concerning the insurance or services it provides. You acknowledge that we are doing so only for the purpose of informing you of an option available to you at your discretion. You are under no obligation to purchase renters' insurance or liability insurance through the Program.

**Resident or Residents**
*[All residents must sign here]*

Regina Sophus

**Owner or Owner's Representative**
*[signs here]*

**Date of Lease Contract**

**January 9, 2015**

## LEASE ADDENDUM FOR RENT CONCESSION
## OR OTHER RENT DISCOUNT

1. **Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. __1027__ in the __ComCapp Timberstone LLC__ _____

   Apartments in _____Houston_____ , Texas; OR the house, duplex, etc. located at (street address) in _____ , Texas.

2. **Rent concession or discount.** As an incentive and bonus to you for signing the TAA Lease Contract, choosing our property, and agreeing to fulfill your obligations for the entire term of the TAA Lease Contract, you will receive a rent concession, _monthly_ discount or other discount described below.

   *[Check all that apply]*

   ☐ **One-time concession.** You will receive a one-time concession off the *market* rent as stated in Paragraph 6 of the TAA Lease Contract in the total amount of $ _____ . This concession will be credited to your rent due for the month(s) of _____
   _____
   _____

   ☒ **Monthly discount.** You will receive a monthly discount of $__0.00__ off of the *market* rent as stated in Paragraph 6 of the TAA Lease Contract. Your discounted monthly rent will be $ __864.00__ for __9__ months.

   ☐ **Other discount.** You will receive the following discount off the *market* rent as stated in Paragraph 6 of the TAA Lease Contract:
   _____
   _____
   _____
   _____
   _____

3. **Market rent.** The market rent for this dwelling is the rent stated in paragraph 6 of the TAA Lease Contract. You acknowledge that the market rent is a fair representation of what the specific dwelling would actually rent for at the time the TAA Lease Contract was negotiated and executed, and is reflective of the rent for a similar dwelling at comparable properties.

4. **Payment or repayment for early move out.** If you move out or terminate your TAA Lease Contract early, in violation of the TAA Lease Contract, this addendum will be immediately terminated.

   You can fulfill your obligations for rent due under the TAA Lease Contract by immediately paying us for all remaining months of rent owed until the end of the TAA Lease Contract term. Rent owed would be based on market rent as stated in paragraph 6 of the TAA Lease Contract if a one-time concession was provided or the rent under paragraph 2 of this addendum if a discount was provided.

   **If you fail to pay all of your obligations for the rent due under the TAA Lease Contract, as stated above, then you will be required to immediately repay us the amounts of all ☒ concessions and/or ☒ discounts *(check those that apply)* that you actually received from us for the months you resided in your dwelling, in addition to all other sums due under the TAA Lease Contract for a lease violation.**

5. **Mitigation of Damages.** We will exercise customary diligence to relet and minimize damages. We will credit all subsequent rent that we actually receive from successor residents against all future rent paid by you to satisfy the terms of this addendum.

6. **Special Provisions.** The following special provisions control over any conflicting provisions of this printed addendum or the TAA Lease Contract.
   In the event that rent is paid late, NSF, rejected or declined, this concession/discount is null and void. If this lease is broken all concessions and discounts will be charged back.
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

**Resident or Residents**
*[All residents must sign here]*

Regina Sophus
_____
_____
_____
_____

**Owner or Owner's Representative**
*[signs here]*
_____

**Date of Lease Contract**

__January 9, 2015__
_____